[Cite as *Libertarian Party v. Husted*, 2017-Ohio-7737.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Libertarian Party of Ohio, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 16AP-496 |
| v. | : | (C.P.C. No. 16CV-554) |
| Jon Husted et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on September 21, 2017

**On brief:** *Mark R. Brown*; *Mark G. Kafantaris*, for appellant. **Argued:** *Mark R. Brown*.

**On brief:** *Michael DeWine*, Attorney General, *Halli Brownfield Watson*, and *Bridget E. Coontz*, for appellees. **Argued:** *Halli Brownfield Watson*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiff-appellant, Libertarian Party of Ohio ("LPO"), appeals the June 7, 2016 decision and entry of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Jon Husted, Ohio Secretary of State, and Mike DeWine, Ohio Attorney General ("appellees"), on LPO's claims that Am.Sub. S.B. No. 193 ("S.B. No. 193") violated the Ohio Constitution. For the following reasons, we affirm.

**I. History**

{¶ 2} The case before us is the latest in a long line of challenges to Ohio's attempts to regulate its elections with regard to ballot access for independent candidates and minor parties, including notable challenges brought by LPO. As recently noted by the Sixth

Circuit Court of Appeals, LPO " 'has struggled to become and remain a ballot-qualified party in Ohio through frequent litigation.' " *Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 387 (6th Cir.2016), *cert. denied*, 137 S.Ct. 651 (2017), quoting *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 405 (6th Cir.2014). Before addressing the procedural history of the instant matter, we begin by briefly reviewing the history of LPO's challenges to ballot access laws in Ohio.

### A. Ballot Access Challenges Prior to S.B. No. 193

{¶ 3} In *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir.2006), the court reviewed LPO's challenge to two Ohio regulations under the First and Fourteenth Amendments to the United States Constitution. Specifically at issue were regulations that "(1) mandate[d] that parties not meeting the five percent vote threshold in the previous election file a petition 120 days in advance of the primary election in order to qualify; and (2) require[d] that parties participate in the March primary in order to appear on the general election ballot." *Id.* at 586. The court found the combination of requirements and their resultant impact on LPO's ability to appear on the general election ballot severely burdened LPO's rights. In so finding, the court observed that LPO "needed to find more than thirty thousand Ohio residents to sign its petition to appear on the 2004 ballot more than one year in advance of the election," a requirement that forced "minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized." *Id.* The court also noted that "[f]orty-eight states have filing deadlines for minor parties later in the election cycle, and forty-three states allow minor parties to nominate candidates in a manner other than the primary election." *Id.* at 594. The court concluded that Ohio's interests in its primary and early-filing requirement were not sufficient to outweigh the severe burden on LPO's rights.

{¶ 4} Following the decision in *Blackwell*, "the Ohio General Assembly [took] no action to establish ballot access standards for minor political parties, leaving no lawful, statutory criteria to be followed by the Secretary of State or the various Boards of Election of each county." *Libertarian Party of Ohio v. Brunner*, 567 F.Supp.2d 1006, 1009 (S.D.Ohio 2008). In the absence of legislation, in 2007, the Ohio Secretary of State issued a directive that maintained Ohio's requirement that minor parties nominate their

candidates by primary election, but altered the party-qualification process by requiring minor parties to "obtain petition signatures equal to one-half of one percent of the votes cast for governor in the 2006 general election," and to "file nominating petitions 100 days before the primary." *Id.* at 1010.

{¶ 5} LPO challenged the directive in federal court, and the court granted a preliminary injunction preventing the directive from going into effect. The court found that "only the legislative branch has the authority, under Articles I and II of the United States Constitution, to prescribe the manner of electing candidates for federal office." *Id.* at 1011. Furthermore, the court found that "[e]ven assuming that [the Directive] was a valid exercise of [the Ohio Secretary of State's] power to regulate elections, the Directive itself imposes unconstitutional burdens on First Amendment rights." *Id.* at 1013. As a result of the invalidity of the directive and the General Assembly's failure to set forth applicable election regulations, the court ordered LPO be placed on the 2008 general election ballot in Ohio.

{¶ 6} Following the decision in *Brunner*, the Ohio Secretary of State entered into a consent decree agreeing not to enforce the interim requirements, and adopted subsequent directives granting LPO continued ballot access through 2011 and beyond. *Libertarian Party of Ohio v. Husted*, S.D.Ohio No. 2:11-CV-722 (Sept. 7, 2011), *vacated as moot*, 497 Fed.Appx. 581 (6th Cir.2012).

{¶ 7} In 2011, the General Assembly enacted Am.Sub.H.B. No. 194 ("H.B. No. 194"), which in part, amended ballot access requirements for political parties. Specifically, H.B. No. 194 required minor parties file petitions with the requisite number of signatures 90 days before the primary, while maintaining the number of signatures required. LPO again filed a challenge in federal court. Finding that H.B. No. 194 imposed severe burdens on LPO's rights without a sufficiently weighty state interest, the court granted a preliminary injunction preventing H.B. No. 194 from taking effect. Following the issuance of the injunction, the General Assembly repealed H.B. No. 194. Thereafter, in 2013, the Ohio Secretary of State issued an additional directive that "continued the practice of recognizing minor political parties and granting them access to the ballot for both the primary and general elections." *Libertarian Party of Ohio v. Husted*, S.D.Ohio No. 2:13-cv-953 (Jan. 7, 2014).

**B. Enactment of S.B. No. 193 and Subsequent Challenges**

{¶ 8}   On November 6, 2013, the General Assembly enacted S.B. No. 193, which is the subject of this appeal and will be discussed further below.  The law had an effective date of February 5, 2014.

**1. Federal Proceedings**

{¶ 9}   Prior to the effective date of S.B. No. 193, LPO and three persons involved with LPO, filed a complaint and a motion for a preliminary injunction against the Ohio Secretary of State in federal district court.  The court granted LPO's first motion for a preliminary injunction.   On November 8, 2013, LPO filed an amended complaint challenging the restrictions in S.B. No. 193 on ballot access and asserting in part that S.B. No. 193 violated Article V, Section 7 of the Ohio Constitution.  On January 7, 2014, the court granted LPO's second motion for a preliminary injunction, preventing S.B. No. 193 from taking effect for the 2014 election.   However, the court declined to address the merits of LPO's claims under the Ohio Constitution at that time.

{¶ 10} On March 7, 2014, LPO filed a second amended complaint and third motion for preliminary injunction in the federal district court asserting that the Ohio Secretary of State violated its First Amendment rights by disqualifying its nominating petitions, preventing its candidates from appearing on the Ohio primary ballot in May 2014.  The Secretary of State asserted that LPO's nominating petitions were disqualified because the paid circulators who obtained signatures for LPO's nominating petitions failed to disclose the name and address of the entity that paid them in the employer information box on the petitions as required by R.C. 3501.38(E)(1).  The district court denied LPO's third motion, finding that R.C. 3501.38(E)(1) placed only a minimal burden on LPO's First Amendment rights and the requirements served a significant interest in detecting and deterring fraud in the signature gathering process.  *Libertarian Party of Ohio v. Husted*, S.D.Ohio No. 2:13-cv-953 (Mar. 19, 2014).  On appeal, on May 1, 2014, the Sixth Circuit affirmed the denial of a preliminary injunction. *Libertarian Party of Ohio v. Husted*, 751 F.3d at 405.

{¶ 11} On September 11, 2014, LPO filed a third amended complaint, asserting among other claims that the Ohio Secretary of State selectively enforced the employer-disclosure requirements of R.C. 3501.39(E)(1) against LPO in violation of the First and Fourteenth Amendments.   On September 15, 2014, LPO filed a fourth motion for a

preliminary injunction and motion for a temporary restraining order, seeking to place its candidates' names on the ballot for the 2014 general election. The federal district court denied the request for a temporary restraining order and the fourth motion for a preliminary injunction.

{¶ 12} Following denial of the fourth preliminary injunction, the parties filed motions and cross-motions for summary judgment regarding LPO's claims that S.B. No. 193 violated the Ohio Constitution and the federal Equal Protection Clause. The federal district court found that S.B. No. 193 did not violate the federal Equal Protection Clause, both on its face and as applied. The court also dismissed LPO's claim that S.B. No. 193 violated the Ohio Constitution as barred by the Eleventh Amendment. On May 20, 2016, the court granted summary judgment in favor of the defendants on LPO's selective enforcement claim. *Libertarian Party of Ohio v. Husted*, 188 F.Supp.3d 665 (S.D.Ohio 2016).

{¶ 13} On appeal, LPO asserted that: (1) the defendants selectively enforced R.C. 3501.38(E)(1) against LPO in violation of the First and Fourteenth Amendments, and (2) S.B. No. 193 violated the federal Equal Protection Clause by denying them the opportunity to participate in the primary election process. The court concluded that the district court did not err in granting summary judgment in favor of the defendants on LPO's federal constitutional challenges. Finally, LPO asserted that the district court erred in dismissing its state constitutional claim under Article V, Section 7 of the Ohio Constitution. The court found that LPO was precluded from pursuing its claim under Article V, Section 7 because, as detailed below, the Franklin County Court of Common Pleas reached a final judgment on such claim. *Libertarian Party of Ohio v. Husted*, 831 F.3d at 406. Therefore, the court affirmed the granting of summary judgment in favor of the defendants. *Id.*

## 2. Ohio Proceedings

{¶ 14} On January 19, 2016, LPO filed in the trial court a declaratory and injunctive action challenging the constitutionality of S.B. No. 193 under Article V, Section 7, and Article I, Section 2 of the Ohio Constitution. On the same day, LPO filed a motion for a temporary restraining order and preliminary injunction against enforcement of S.B. No. 193. On January 27, 2016, appellees filed a memorandum in opposition to

LPO's motion for a temporary restraining order and preliminary injunction. On February 1, 2016, LPO filed a reply. On February 2, 2016, the trial court filed an entry denying LPO's motion for a temporary restraining order and setting a hearing on LPO's request for a preliminary injunction.

{¶ 15} On February 19, 2016, appellees filed an answer and a motion for summary judgment. On March 2, 2016, LPO filed a response to appellees' motion for summary judgment and a motion under Civ.R. 56(F) to continue appellees' motion for summary judgment. On March 9, 2016, appellees filed a memo contra LPO's Civ.R. 56(F) motion and a reply in support of their motion for summary judgment. On March 14, 2016, LPO filed a reply in support of its motion for a continuance pursuant to Civ.R. 56(F).

{¶ 16} On March 17, 2016, appellees filed a motion to strike LPO's March 14, 2016 reply in support of its motion for a continuance pursuant to Civ.R. 56(F). On the same day, LPO filed a motion for leave to cure its reply in excess of seven pages and a memorandum in opposition to appellees' motion to strike. On April 5, 2016, the trial court granted LPO leave to cure its reply in excess of seven pages.

{¶ 17} On April 18, 2016, the trial court filed an entry denying LPO's motion under Civ.R. 56(F) for a continuance. On June 7, 2016, the trial court filed a decision and entry granting summary judgment in favor of appellees and rendering moot LPO's motion for a preliminary injunction. On the same day, LPO filed a motion for new trial pursuant to Civ.R. 59 and a motion to stay judgment pursuant to Civ.R. 62.[1] On June 21, 2016, appellees filed a memorandum in opposition to LPO's motion for new trial and motion to stay judgment. On June 23, 2016, LPO filed a reply in support of its motion for a new trial.

{¶ 18} On July 6, 2016, LPO filed a notice of appeal to this court from the June 7, 2016 judgment of the trial court granting summary judgment. On July 7, 2016, the trial court ordered the matter stayed during the pendency of the appeal. On August 5, 2016, this court remanded the matter to the trial court for the limited purpose of allowing the trial court to resolve the pending Civ.R. 59 motion for new trial.

---

[1] We note that although the title of LPO's motion referred to Civ.R. 60, the memorandum in support of the motion cited Civ.R. 62(A).

{¶ 19} On August 8, 2016, LPO filed a notice of supplemental authority. On August 10, 2016, appellees filed a motion to strike LPO's August 8, 2016 notice of supplemental authority. On the same day, LPO filed a motion for leave to file a notice of supplemental authority and a memorandum in opposition to appellees' August 10, 2016 motion to strike. On August 15, 2016, appellees filed a memorandum in opposition to LPO's motion for leave to file notice of supplemental authority. On September 1, 2016, the trial court filed a decision and entry denying LPO's motion for a new trial.

## II. Assignments of Error

{¶ 20} LPO appeals and assigns the following six assignments of error for our review:

> [I.] The Court of Common Pleas erred by concluding that S.B. [No.] 193, Ohio's new ballot access denying to new political parties their previous right to hold primaries, does not violate Article V, § 7 of Ohio's Constitution.
>
> [II.] The Court of Common Pleas erred by concluding that S.B. [No.] 193's violation of Article V, § 7 of Ohio's Constitution presents a political question and is not justiciable.
>
> [III.] The Court of Common Pleas erred by concluding that Ohio's guarantee of equal protection of the laws, located in Article I, § 2 of the Ohio Constitution, is limited by federal precedents interpreting the federal Equal Protection Clause found in the Fourteenth Amendment to the United States Constitution.
>
> [IV.] The Court of Common Pleas erred by not applying the more-protective constitutional analysis prescribed by the Ohio Supreme Court under Article I, § 2 of Ohio's Constitution to Appellant's claim that S.B. [No.] 193 violates equal protection of the law.
>
> [V.] The Court of Common Pleas erred in concluding that S.B. [No.] 193 is constitutional under federal Equal Protection Clause precedents and the *Anderson/Burdick* analysis, which establish a floor for Ohio's constitutional guarantee of equal protection of the law.
>
> [VI.] The Court of Common Pleas erred by refusing to allow Appellant to conduct discovery in order to properly respond to Appellees' motion for summary judgment.

**III. Constitutionality of S.B. NO. 193**

{¶ 21} In its first, second, third, fourth, and fifth assignments of error, LPO asserts that S.B. No. 193 violates Article V, Section 7, and Article I, Section 2 of the Ohio Constitution.

**A. Applicable Law**

{¶ 22} We begin by reviewing the statutes relevant to the instant matter. Prior to the enactment of S.B. No. 193, R.C. 3501.01(F) provided:

> "Political party" means any group of voters meeting the requirements set forth in section 3517.01 of the Revised Code for the formation and existence of a political party.
>
> (1) "Major political party" means any political party organized under the laws of this state whose candidate for governor or nominees for presidential electors received no less than twenty per cent of the total vote cast for such office at the most recent regular state election.
>
> (2) "Intermediate political party" means any political party organized under the laws of this state whose candidate for governor or nominees for presidential electors received less than twenty per cent but not less than ten per cent of the total vote cast for such office at the most recent regular state election.
>
> (3) "Minor political party" means any political party organized under the laws of this state whose candidate for governor or nominees for presidential electors received less than ten per cent but not less than five per cent of the total vote cast for such office at the most recent regular state election or which has filed with the secretary of state, subsequent to any election in which it received less than five per cent of such vote, a petition signed by qualified electors equal in number to at least one per cent of the total vote cast for such office in the last preceding regular state election, except that a newly formed political party shall be known as a minor political party until the time of the first election for governor or president which occurs not less than twelve months subsequent to the formation of such party, after which election the status of such party shall be determined by the vote for the office of governor or president.

{¶ 23} As amended by S.B. No. 193, R.C. 3501.01(F) now provides:

"Political party" means any group of voters meeting the requirements set forth in section 3517.01 of the Revised Code for the formation and existence of a political party.

(1) "Major political party" means any political party organized under the laws of this state whose candidate for governor or nominees for presidential electors received not less than twenty per cent of the total vote cast for such office at the most recent regular state election.

(2) "Minor political party" means any political party organized under the laws of this state that meets either of the following requirements:

(a) Except as otherwise provided in this division, the political party's candidate for governor or nominees for presidential electors received less than twenty per cent but not less than three per cent of the total vote cast for such office at the most recent regular state election. A political party that meets the requirements of this division remains a political party for a period of four years after meeting those requirements.

(b) The political party has filed with the secretary of state, subsequent to its failure to meet the requirements of division (F)(2)(a) of this section, a petition that meets the requirements of section 3517.01 of the Revised Code.

A newly formed political party shall be known as a minor political party until the time of the first election for governor or president which occurs not less than twelve months subsequent to the formation of such party, after which election the status of such party shall be determined by the vote for the office of governor or president.

{¶ 24} Prior to the enactment of S.B. No. 193, R.C. 3517.01 provided, in pertinent part:

(A)

(1) A political party within the meaning of Title XXXV of the Revised Code is any group of voters that, at the most recent regular state election, polled for its candidate for governor in the state or nominees for presidential electors at least five per cent of the entire vote cast for that office or that filed with the secretary of state, subsequent to any election in which it received less than five per cent of that vote, a petition signed by qualified electors equal in number to at least one per cent of the total vote for governor or nominees for presidential electors at the most recent election, declaring their intention of organizing a political party, the name of which shall be stated in the declaration, and of participating in the

succeeding primary election, held in even-numbered years, that occurs more than one hundred twenty days after the date of filing. No such group of electors shall assume a name or designation that is similar, in the opinion of the secretary of state, to that of an existing political party as to confuse or mislead the voters at an election. If any political party fails to cast five per cent of the total vote cast at an election for the office of governor or president, it shall cease to be a political party.

(2) A campaign committee shall be legally liable for any debts, contracts, or expenditures incurred or executed in its name.

{¶ 25} As amended by S.B. No. 193, R.C. 3517.01 now provides in pertinent part:

(A)

(1) A political party within the meaning of Title XXXV of the Revised Code is any group of voters that meets either of the following requirements:

(a) Except as otherwise provided in this division, at the most recent regular state election, the group polled for its candidate for governor in the state or nominees for presidential electors at least three per cent of the entire vote cast for that office. A group that meets the requirements of this division remains a political party for a period of four years after meeting those requirements.

(b) The group filed with the secretary of state, subsequent to its failure to meet the requirements of division (A)(1)(a) of this section, a party formation petition that meets all of the following requirements:

(i) The petition is signed by qualified electors equal in number to at least one per cent of the total vote for governor or nominees for presidential electors at the most recent election for such office.

(ii) The petition is signed by not fewer than five hundred qualified electors from each of at least a minimum of one-half of the congressional districts in this state. If an odd number of congressional districts exists in this state, the number of districts that results from dividing the number of congressional districts by two shall be rounded up to the next whole number.

(iii) The petition declares the petitioners' intention of organizing a political party, the name of which shall be stated in the declaration, and of participating in the succeeding general election, held in even-numbered years, that occurs

more than one hundred twenty-five days after the date of filing.

(iv) The petition designates a committee of not less than three nor more than five individuals of the petitioners, who shall represent the petitioners in all matters relating to the petition. Notice of all matters or proceedings pertaining to the petition may be served on the committee, or any of them, either personally or by registered mail, or by leaving such notice at the usual place of residence of each of them.

{¶ 26} Thus, prior to the enactment of S.B. No. 193, Ohio had three categories of political parties: major, intermediate, and minor. Following the enactment of S.B. No. 193, two categories of political party were created: major and minor. Minor political parties are defined as those parties which meet one of the following requirements: (1) the party's candidate for governor or nominees for presidential electors received not less than 3 percent but less than 20 percent of the total vote at the most recent regular election for such office, in which case such party would remain a recognized minor political party for a period of 4 years, or (2) the party filed a party formation petition meeting the requirements of R.C. 3517.01, in which case it would remain a recognized minor political party until the next election for governor or president occurring not less than 12 months following the formation of the party. In order for a newly formed political party to qualify as a minor party under R.C. 3501.01(F)(2)(b), the petition must meet the following three requirements under R.C. 3517.01(A)(1)(b): (1) the petition must be signed by qualified electors equal to at least 1 percent of the total vote for nominees for presidential electors or governor at the most recent election for such office, (2) the petition must be signed by 500 qualified electors from each of at least half of the congressional districts in the state, (3) the petition must declare the intent of forming the party named in the petition and of participating in the next general election held in even-numbered years that occurs more than 125 days after the date of filing, and (4) the petition must designate a committee of 3 to 5 petitioners to represent the petitioners.

{¶ 27} R.C. 3501.01(E), which was unchanged by S.B. No. 193, provides:

(1) "Primary" or "primary election" means an election held for the purpose of nominating persons as candidates of political parties for election to offices, and for the purpose of electing persons as members of the controlling committees of political parties and as delegates and alternates to the conventions of

political parties. Primary elections shall be held on the first Tuesday after the first Monday in May of each year except in years in which a presidential primary election is held.

(2) "Presidential primary election" means a primary election as defined by division (E)(1) of this section at which an election is held for the purpose of choosing delegates and alternates to the national conventions of the major political parties pursuant to section 3513.12 of the Revised Code. Unless otherwise specified, presidential primary elections are included in references to primary elections. In years in which a presidential primary election is held, all primary elections shall be held on the first Tuesday after the first Monday in March except as otherwise authorized by a municipal or county charter.

{¶ 28} Prior to the enactment of S.B. No. 193, R.C. 3517.012 provided:

When a petition meeting the requirements of section 3517.01 of the Revised Code declaring the intention to organize a political party is filed with the secretary of state, the new party comes into legal existence on the date of filing and is entitled to hold a primary election as set out in section 3513.01 of the Revised Code, at the primary election, held in even-numbered years that occurs more than one hundred twenty days after the date of filing.

{¶ 29} As amended by S.B. No. 193, R.C. 3517.012 now provides:

(A)

(1) When a party formation petition meeting the requirements of section 3517.01 of the Revised Code declaring the intention to organize a political party is filed with the secretary of state, the new party comes into legal existence on the date of filing and is entitled to nominate candidates to appear on the ballot at the general election held in even-numbered years that occurs more than one hundred twenty-five days after the date of filing.

(2)

(a) Upon receiving a party formation petition filed under division (A)(1) of this section, the secretary of state shall promptly transmit to each board of elections the separate petition papers that purport to contain signatures of electors of that board's county.

(b) Not later than the one hundred eighteenth day before the day of the general election, each board shall examine and determine the sufficiency of the signatures on the petition

papers and shall return them to the secretary of state, together with the board's certification of its determination as to the validity or invalidity of the signatures on the petition.

(c) Any qualified elector may file a written protest against the petition with the secretary of state not later than the one hundred fourteenth day before the day of the general election. Any such protest shall be resolved in the manner specified under section 3501.39 of the Revised Code.

(d) Not later than the ninety-fifth day before the day of the general election, the secretary of state shall determine whether the party formation petition is sufficient and shall notify the committee designated in the petition of that determination.

(B)

(1) Not later than one hundred ten days before the day of that general election and not earlier than the day the applicable party formation petition is filed, each candidate or pair of joint candidates wishing to appear on the ballot at the general election as the nominee or nominees of the party that filed the party formation petition shall file a nominating petition, on a form prescribed by the secretary of state, that includes the name of the political party that submitted the party formation petition. Except as otherwise provided in this section and sections 3505.03, 3505.08, 3506.11, 3513.31, 3513.311, and 3513.312 of the Revised Code, the provisions of the Revised Code concerning independent candidates who file nominating petitions apply to candidates who file nominating petitions under this section.

(2)

(a) If the candidacy is to be submitted to electors throughout the entire state, the nominating petition, including a petition for joint candidates for the offices of governor and lieutenant governor, shall be signed by at least fifty qualified electors who have not voted as a member of a different political party at any primary election within the current year or the immediately preceding two calendar years.

(b) Except as otherwise provided in this division, if the candidacy is to be submitted only to electors within a district, political subdivision, or portion thereof, the nominating petition shall be signed by not less than five qualified electors who have not voted as a member of a different political party at any primary election within the current year or the immediately preceding two calendar years.

(3)

(a) Each board of elections that is responsible to verify signatures on the nominating petition shall examine and determine the sufficiency of those signatures not later than the one hundred fifth day before the day of the general election and shall be resolved as specified in that section.

(b) Written protests against the petition may be filed in the manner specified under section 3513.263 of the Revised Code not later than the one hundredth day before the general election and shall be resolved as specified in that section.

(c) Not later than the ninety-fifth day before the day of the general election, the secretary of state or the board of elections, as applicable, shall determine whether the nominating petition is sufficient and shall notify the candidate and the committee designated in the party formation petition of that determination.

(C)

(1) After being notified that the political party has submitted a sufficient party formation petition under division (A) of this section, the committee designated in a party formation petition shall, not later than the seventy-fifth day before the day of the general election, certify to the secretary of state a slate of candidates consisting of candidates or joint candidates who submitted sufficient nominating petitions under division (B) of this section. The slate certifying the candidates shall be on a form prescribed by the secretary of state and signed by all of the individuals of the committee designated in the party formation petition. In no event shall the slate of candidates include more than one candidate for any public office or more than one set of joint candidates for the offices of governor and lieutenant governor. The names of the candidates or joint candidates so certified shall appear on the ballot at the general election as that party's nominees for those offices. For purposes of this division, "joint candidates" means the joint candidates for the offices of governor and lieutenant governor.

(2) If a candidate's nominating petition is insufficient or if the committee does not certify the candidate's name under division (C)(1) of this section, the candidate shall not appear on the ballot in the general election.

(3) If a party formation petition is insufficient, no candidate shall appear on the ballot in the general election as that political party's nominee, regardless of whether any candidate's nominating petition is sufficient.

{¶ 30} Thus, prior to S.B. No. 193, a newly formed political party was able to participate in the primary election process.  However, as amended by S.B. No. 193, candidates of a newly formed political party are no longer able to participate in the primary election process. Instead, candidates of a newly formed political party must submit: (1) if the candidacy is for a statewide office, a nominating petition signed by at least 50 qualified electors who have not voted as a member of a different political party at any primary election within the current year or the immediately preceding 2 calendar years, or (2) if the candidacy is to be submitted only to electors within a district, political subdivision, or portion thereof, a nominating petition signed by not less than 5 qualified electors who have not voted as a member of a different political party at any primary election within the current year or the immediately preceding 2 calendar years.  Then, the committee designated in the party formation petition must certify a slate of candidates who submitted sufficient nominating petitions.

## B.  Standard of Review

{¶ 31} When reviewing the constitutionality of statutes, we are guided by the presumption that enactments of the General Assembly are constitutional.  *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, ¶ 10.  *See Haight v. Minchak*, 146 Ohio St.3d 481, 2016-Ohio-1053, ¶ 11, quoting *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas*, 9 Ohio St.2d 159, 162 (1967) (" '[T]he state Constitution is primarily a *limitation* on legislative power of the General Assembly.  It follows that the General Assembly may pass any law unless it is specifically prohibited by the state or federal Constitutions.' "). (Emphasis sic.)  The party challenging the constitutionality of the statute bears the burden of demonstrating beyond a reasonable doubt that the statute and the constitutional provisions are clearly incompatible.  *Haight* at ¶ 11, citing *Univ. Hts. v. O'Leary*, 68 Ohio St.2d 130, 135 (1981).  In determining whether a statute conflicts with a constitutional provision, courts must liberally construe the statute "to save [it] from constitutional infirmity."  *Id.*, citing *Desenco, Inc. v. Akron*, 84 Ohio St.3d 535, 538 (1999). Nevertheless, where the incompatibility between a statute and a constitutional provision is clear, a court has a duty to declare the statute unconstitutional.  *Mole* at ¶ 11, citing *Cincinnati City School Dist. Bd. of Edn. v. Walter*, 58 Ohio St.2d 368, 383 (1979).

## C. Article V, Section 7 of the Ohio Constitution

{¶ 32} We next address LPO's arguments in its first and second assignments of error that S.B. No. 193 violates Article V, Section 7 of the Ohio Constitution. Article V, Section 7 provides:

> All nominations for elective state, district, county and municipal offices shall be made at direct primary elections or by petition as provided by law, and provision shall be made by law for a preferential vote for United States senator; but direct primaries shall not be held for the nomination of township officers or for the officers of municipalities of less than two thousand population, unless petitioned for by a majority of the electors of such township or municipality. All delegates from this state to the national conventions of political parties shall be chosen by direct vote of the electors in a manner provided by law. Each candidate for such delegate shall state his first and second choices for the presidency, but the name of no candidate for the presidency shall be so used without his written authority.

{¶ 33} LPO contends that Article V, Section 7 only permits the nomination of party candidates by primary election, and, therefore, S.B. No. 193 violates such provision because it provides for the nomination of party candidates by both primary election and petition. Appellees respond that Article V, Section 7 of the Ohio Constitution cannot serve as a basis for LPO's claim because it is not a self-executing source of independent protection. "A constitutional provision is self-executing when it is complete in itself and becomes operative without the aid of supplemental or enabling legislation." *State v. Williams*, 88 Ohio St.3d 513, 521 (2000), citing *In re Protest Filed by Citizens for the Merit Selection of Judges, Inc.*, 49 Ohio St.3d 102, 104 (1990). Thus, "the words of a constitutional provision must be sufficiently precise in order to provide clear guidance to courts with respect to their application if the provision is to be deemed self-executing." *Williams* at 521.

{¶ 34} Here, Article V, Section 7 explicitly provides for two methods for "[a]ll nominations for elective state, district, county and municipal offices" to be made: (1) "direct primary elections," or (2) "by petition as provided by law." However, it does not provide the method by which petitions are to be submitted or approved. Indeed, by stating that petitions are to be made "as provided by law," the provision explicitly reserves the proper construction of such petitions to subsequent enactments by the General

Assembly. Although the plain language of this provision suggests that it is not self-executing because nominations by petition cannot be operative without the aid of legislation, we need not so decide in order to resolve LPO's claim.

{¶ 35} Indeed, assuming, arguendo, that Article V, Section 7 is self-executing, LPO's contention that S.B. No. 193 violates the provision nevertheless fails. In support of its contention that Article V, Section 7 permits the nomination of candidates by primary election alone, LPO points to the Sixth Circuit's decision in *Blackwell* in which the court stated that Ohio's "Constitution requires that all political parties, including minor parties, nominate their candidates at primary elections." *Blackwell* at 582.

{¶ 36} As the trial court correctly observed, at the time the Sixth Circuit decided *Blackwell* there was no provision in Ohio statutory law allowing for a nomination by petition for a candidate affiliated with a political party. However, as we have previously stated, the plain language of Article V, Section 7 provides for two methods for nominations to be made: by direct primary election or nomination by petition. The fact that the General Assembly did not pass legislation enabling nomination by petition for party candidates as provided by Article V, Section 7 until the enactment of S.B. No. 193 does not deprive such provision of its force and meaning. *State ex rel. Carmean v. Bd. of Edn.*, 170 Ohio St. 415, 422 (1960) ("It is axiomatic in statutory construction that words are not inserted into an act without some purpose."); *State ex rel. Maurer v. Sheward*, 71 Ohio St.3d 513, 521 (1994) (stating "if possible we must give meaning to every word in a provision"); *Cheap Escape Co., Inc. v. Haddox, L.L.C.*, 120 Ohio St.3d 493, 2008-Ohio-6323, ¶ 16. Furthermore, we are not bound by a federal court's statement in interpreting the Ohio Constitution. *Mole* at ¶ 21, citing *Doe v. State*, 189 P.3d 999, 1007 (Alaska 2008) ("Federal opinions do not control our independent analyses in interpreting the Ohio Constitution, even when we look to federal precedent for guidance."); *Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293 (1982) ("As a number of recent State Supreme Court decisions demonstrate, a state court is entirely free to read its own State's constitution more broadly than this Court reads the Federal Constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guarantee."). Therefore, we find LPO's contentions regarding *Blackwell* to be without merit.

{¶ 37} Next, LPO points to the Ohio Supreme Court's decision in *State ex rel. Gottlieb v. Sulligan*, 175 Ohio St. 238 (1963), to support its position that Article V, Section 7 does not allow for nomination of candidates by petition.  Specifically, LPO contends that *Sulligan* stands for the proposition that Article V, Section 7 requires "political parties [to] select their candidates through direct primaries."  (LPO's Brief at 19.)

{¶ 38} In *Sulligan*, the court examined the question of "whether a person selected as a party candidate for an office in a primary election who withdraws his candidacy for that office is eligible for selection as a party candidate by the party committee to fill a vacancy in the nomination for another office created by the withdrawal of the candidate originally nominated."  *Id.* at 239.  The court found that "Section 7, Article V of the Ohio Constitution, provides that all nominations must be by direct primary or by petition."  *Id.* at 241.  Furthermore, the court stated that "[a]n examination of the election laws indicates that the phrase, 'nominating petition,' has a specific meaning."  *Id.* at 240. In determining the meaning of the phrase "nominating petition," the court explained:

> *Under our statutes* the candidates for public office may gain nomination by two methods: One, by filing a declaration of candidacy accompanied by a petition entitling one to be a participant in the direct party primary wherein candidates from all political parties seek their nomination; or, two, by what is designated as a nominating petition, the method by which the independent candidate may seek his place on the elective ballot. In other words, the nominating petition is the method by which the independent candidate seeks his place on the elective ballot.

(Emphasis added.)  *Id.* at 240-41, citing former R.C. 3513.252.

{¶ 39} Thus, the court's interpretation of the phrase "nominating petition" in *Sulligan* was based upon then-existing statutory provisions, not the constitutional framework of Article V, Section 7. Because Article V, Section 7 provides that "[a]ll nominations * * * shall be made at direct primary elections or by petition *as provided by law*," the General Assembly possesses constitutional authority to legislate the scope of a nominating petition.  (Emphasis added.)  Therefore, Article V, Section 7 does not prohibit the General Assembly from enacting statutes providing for nomination by petition for candidates regardless of whether the candidate is affiliated with a political party.  *See*

*Sulligan* at 242, quoting *Mullholand v. Batt*, 164 Ohio St. 362 (1955), paragraph one of the syllabus (" 'Under the provisions of Section 27 of Article II of the Constitution of Ohio relating to the legislative powers of the General Assembly, the election and appointment of all officers, and the filling of all vacancies, not otherwise provided for by such Constitution or the Constitution of the United States, shall be made in such manner as may be directed by law.' ").  Accordingly, we do not find LPO's contentions regarding *Sulligan* to be persuasive.

{¶ 40} Finally, LPO states that the adoption of S.B. No. 193 "marks the first occasion since Article V, [Section] 7 of Ohio's Constitution was adopted and implemented that Ohio law has had any procedure for any qualified political parties to nominate candidates for federal, state and local office without primaries."  (LPO's Brief at 27.)  For the foregoing reasons, we are not persuaded by LPO's contention that the history of the nomination process in Ohio is controlling over the express terms of the constitutional provision.  Therefore, assuming, arguendo, that Article V, Section 7 is self-executing, we conclude that LPO has failed to overcome the presumption of constitutionality by demonstrating beyond a reasonable doubt that the challenged provisions of S.B. No. 193 violate Article V, Section 7 of the Ohio Constitution. *Mole* at ¶ 10-11.

{¶ 41} Accordingly, we overrule LPO's first assignment of error.  Having reached the merits of LPO's first assignment of error in finding that S.B. No. 193 does not violate Article V, Section 7 of the Ohio Constitution, we need not address LPO's contentions regarding whether Article V, Section 7 is justiciable.  Accordingly, LPO's second assignment of error is rendered moot.

## D.  Article I, Section 2 of the Ohio Constitution

{¶ 42} In its third, fourth, and fifth assignments of error, LPO contends that S.B. No. 193 violates the guarantee of equal protection provided in Article I, Section 2 of the Ohio Constitution.  Specifically, LPO contends the trial court erred in its analysis of LPO's claim under Ohio's constitutional guarantee of equal protection by applying federal precedent interpreting the Equal Protection Clause in the Fourteenth Amendment to the United States Constitution.

## 1. Constitutional Protections

{¶ 43} Article I, Section 2 provides in pertinent part: "All political power is inherent in the people. Government is instituted for their equal protection and benefit." The Fourteenth Amendment, Section 1 to the United States Constitution provides in pertinent part that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

{¶ 44} "An equal-protection analysis of any law centers upon the law's classification of persons and whether the classification relates to a legitimate government interest." *Mole* at ¶ 24, citing *State ex rel. Doersam v. Indus. Comm.*, 45 Ohio St.3d 115, 119-20 (1989). The federal guarantee of equal protection does not deny the government the power to treat different classes of persons in different ways, but rather denies the power to provide that "different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." (Quotations and citation omitted.) *Johnson v. Robison*, 415 U.S. 361, 374 (1974). *See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (stating that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike").

{¶ 45} Historically, Ohio courts have construed and analyzed the Equal Protection Clauses of the United States Constitution and the Ohio Constitution identically. *Mole* at ¶ 14, quoting *Am. Assn. of Univ. Professors v. Cent. State Univ.*, 87 Ohio St.3d 55, 60 (1999) (noting that in prior analyses the court had held that " 'the federal and Ohio Equal Protection Clauses are to be construed and analyzed identically' "). However, recently, the Ohio Supreme Court has reaffirmed its holding that "the Ohio Constitution is a document of independent force." *Id.*, citing *Arnold v. Cleveland*, 67 Ohio St.3d 35, 42 (1993). *See State v. Robinette*, 80 Ohio St.3d 234, 238 (1997) (recognizing that states may "rely on their own constitutions to provide broader protection for individual rights, independent of protections afforded by the United States Constitution"). Thus, the Ohio Supreme Court has stated that interpretation of the Ohio Constitution is "not confined by the federal courts' interpretations of similar provisions in the federal Constitution." *Mole* at ¶ 21. Instead, Ohio courts "can and should borrow from well-reasoned and persuasive precedent from other states and the federal courts," but also "may, and should, consider

Ohio's conditions and traditions in interpreting our own state's constitutional guarantees * * * particularly * * * whenever the United States Supreme Court's decisions dilute or underenforce important individual rights and protections." *Id.* at ¶ 22. In accordance with these principles, the Ohio Supreme Court has found that the guarantee of equal protection in Article I, Section 2 of the Ohio Constitution is independent from its federal counterpart. *Id.* at ¶ 23. With this in mind, we will consider precedent from the federal courts as well as Ohio's own precedent in interpreting Article I, Section 2.

## 2. The *Anderson-Burdick* Test

{¶ 46} Courts reviewing a challenge under the First and Fourteenth Amendments to the United States Constitution in voting and ballot access cases apply the balancing test articulated by the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and restated in *Burdick v. Takushi*, 504 U.S. 428 (1992), together commonly referred to as the "*Anderson-Burdick* test." Under the *Anderson-Burdick* test, the court must: (1) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate," and (2) "identify and evaluate the precise interests put forward by the state as justifications for the burden imposed by its rule." *Anderson* at 789. *See State ex rel. Watson v. Hamilton Cty. Bd. of Elections*, 88 Ohio St.3d 239, 259 (2000). In evaluating the interests identified by the state as justifications for the restriction, a court must also "determine the legitimacy and strength of each of those interests[, and] consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson* at 789.

{¶ 47} The extent to which the challenged law burdens First and Fourteenth Amendment rights determines the level of scrutiny that a court applies when reviewing the state's justification for the burden. When the challenged law subjects those rights to a severe burden, we apply strict scrutiny in determining whether the law is narrowly tailored to serve a compelling state interest. *Burdick* at 434. *See Watson* at 259, citing *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir.1988) (noting that "a law severely burdens voting rights if it discriminates based on political content instead of neutral factors or if there are few alternative means of access to the ballot"). However, when a law imposes a lesser burden, we apply "a more flexible standard" in which "the

state's important regulatory interests" are generally sufficient to justify " 'reasonable, nondiscriminatory restrictions.' " *Burdick* at 434, quoting *Anderson* at 788. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir.2012); *Watson* at 259, citing *State ex rel. Purdy v. Clermont Cty. Bd. of Elections*, 77 Ohio St.3d 338, 342-43 (1996) (stating that "not every statutory restriction limiting the field of candidates need advance a compelling state interest"). Additionally, we must consider the combined effect of any burden created by the challenged election regulations, rather than the burden of each individual law. *See Blackwell* at 586 (stating that "[o]ur inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden"). Thus, "[r]ather than applying any 'litmus test' that would neatly separate valid from invalid restrictions, * * * a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008).

### 3. <u>Applicable Test</u>

{¶ 48} We next consider LPO's argument that the trial court erred in applying the *Anderson-Burdick* test in its analysis of LPO's challenge to S.B. No. 193. LPO contends the *Anderson-Burdick* test is inapplicable because its equal protection claim under Article I, Section 2 of the Ohio Constitution was not coupled with a corresponding claim under the First Amendment to the United States Constitution. Instead, LPO asserts that its "pure state law claim" under Article I, Section 2 "uses Article V, [Section] 7 as the underlying right." (LPO's Brief at 34.) On review, we conclude the *Anderson-Burdick* test applies to LPO's claim under Ohio's Equal Protection Clause. In reaching this conclusion, we are guided by both federal and Ohio caselaw.

{¶ 49} In *Green Party of Tennessee v. Hargett*, 791 F.3d 684 (6th Cir.2015), the court considered whether the *Anderson-Burdick* test applied in the context of an equal protection challenge to a ballot retention statute. The court explained:

> While the Supreme Court has not yet applied this test to ballot-access challenges on pure equal-protection grounds, our cases hold that the *Anderson-Burdick* test serves as "a single standard for evaluating challenges to voting restrictions." *Obama for Am.* [*v.*] *Husted*, 697 F.3d 423, 430

> (6th Cir.2012). Further, many federal courts of appeals have applied the *Anderson-Burdick* balancing test to both First Amendment and Equal Protection Clause challenges to ballot-access laws. *See e.g., Rogers v. Corbett*, 468 F.3d 188, 193-94 (3d Cir.2006) (abandoning traditional tiers of equal-protection scrutiny and applying *Anderson*); *Republican Party of Ark. v. Faulkner Cty., Ark.*, 49 F.3d 1289, 1293 n.2 (8th Cir.1995) ("In election cases, equal protection challenges essentially constitute a branch of the associational rights tree."); *Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir.1992) (applying the *Anderson* balancing test).

*Id.* at 692. The court noted that in a prior case, it had applied the "framework of *Anderson-Burdick* to a ballot-ordering equal-protection claim because 'the plaintiffs' claim draws not only on the Equal Protection Clause, but also on the First Amendment: essentially, the plaintiffs argue that they have been denied an equal opportunity to exercise their rights to association and political expression.' " *Id.* at 692-93. The court ultimately concluded that because the plaintiffs argued that "the ballot-retention statute denies them an equal opportunity to exercise their rights to association and political expression," the *Anderson-Burdick* test applied. *Id.* at 693.

{¶ 50} The Ohio Supreme Court has considered application of the *Anderson-Burdick* test in a mandamus action contesting the constitutionality of a ballot access restriction. *State ex rel. Brown v. Ashtabula Cty. Bd. of Elections*, 142 Ohio St.3d 370, 2014-Ohio-4022.[2] The plurality opinion found that the "standards articulated by the Supreme Court in *Anderson* and *Burdick* * * * apply in civil litigation challenging the constitutionality of ballot restrictions." *Id.* at ¶ 22. However, the plurality declined to apply the *Anderson-Burdick* test in that case, finding that while *Anderson* and *Burdick* "inform[ed] our analysis, * * * those cases are not writ actions and do not involve the unique burdens that control the adjudication of original actions in this court." *Id.*

{¶ 51} In her opinion concurring in judgment in *Brown*, Chief Justice O'Connor discussed the application of the *Anderson-Burdick* test in equal protection cases:

> Equal protection applies not just to the initial allocation of the franchise, but also to the manner of its exercise. *Bush v. Gore*, 531 U.S. 98, 104 (2000). The court made clear in *Crawford* [*v. Marion Cty. Elections Bd.*, 553 U.S. 181 (2008)] that

---

[2] We note that the relators in *Brown* raised claims under both federal and state constitutional provisions, including both the federal and Ohio's Equal Protection Clauses.

> equal-protection election challenges are subject to the same *Anderson/Burdick* analysis as are First Amendment ballot-access challenges. *See Northeast Ohio Coalition for the Homeless v. Husted,* 696 F.3d 580, 592 (6th Cir.2012).
>
> The state argues that rational-basis review should apply because the classifications at issue are neutral. The state's position misconstrues the law. Rational-basis review applies to laws that draw nondiscriminatory classifications *and impose no burden on the right to vote. McDonald v. Bd. of Election Commrs. of Chicago*, 394 U.S. 802, 807-09 (1969). But where a plaintiff alleges that the state has burdened voting rights through disparate treatment, the *Anderson/Burdick* balancing test is applicable. *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir.2012).

(Emphasis sic.)   *Id.* at ¶ 34-35. We find Chief Justice O'Connor's concurrence to be informative in this case. Thus, although the plurality did not apply the *Anderson-Burdick* test in the context of a mandamus action, a majority of the court agreed that the *Anderson-Burdick* test applied in civil cases challenging the constitutionality of ballot restrictions, as in the present matter.

{¶ 52} Here, LPO claims it is denied equal protection of law because the provisions of S.B. No. 193 differentiate between major and minor parties. As in *Hargett*, such claim necessarily involves the rights of association and political expression. Therefore, considering the foregoing, we find that the *Anderson-Burdick* test controls our analysis of LPO's equal protection claim.

{¶ 53} LPO also contends that, because "Ohio's guarantee of equal protection is not limited by the reach of the federal Equal Protection Clause," the trial court should have applied an analytical framework specific to challenges made under Article I, Section 2 of the Ohio Constitution. (LPO's Brief at 35.) LPO advances two standards for our consideration. First, citing to *State v. Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, LPO contends that "[t]o the extent Article V, [Section] 7 reflects a fundamental right to a primary, strict scrutiny is * * * required." (LPO's Brief at 36.) We have already determined that Article V, Section 7 provides for nomination at direct primary elections or by petition as provided by law. Therefore, we find LPO's contention to be without merit. Furthermore, LPO advances no authority or reasons in support of its contention that we should consider the right to a primary a fundamental right under the Ohio Constitution.

In the absence of any citation to legal authority or reasons in support of such contention, we decline to consider it. App.R. 16(A)(7). *See Paranthaman v. State Auto Prop. & Cas. Ins. Co.*, 10th Dist. No. 14AP-221, 2014-Ohio-4948, ¶ 48, citing *Legacy Academy for Leaders v. Mt. Calvary Pentecostal Church*, 10th Dist. No. 13AP-203, 2013-Ohio-4214, ¶ 20 ("An appellate court may reject an argument on appeal when the appellant fails to cite any legal authority in support of that argument."); *Cook v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-852, 2015-Ohio-4966, ¶ 40, quoting *Bond v. Canal Winchester*, 10th Dist. No. 07AP-556, 2008-Ohio-945, ¶ 16 (" 'It is the duty of the appellant, not the appellate court, to construct the legal arguments necessary to support the appellant's assignments of error.' ").

{¶ 54} Second, LPO contends that even if the right to a primary is not a fundamental right, the Ohio Supreme Court's analysis in *Mole* should control our analysis here.[3]  Specifically, LPO contends that *Mole* identified a more-protective test to apply in equal protection challenges under the Ohio Constitution.  However, contrary to LPO's contentions, the court in *Mole* applied the rational basis standard of review common to both federal and state equal protection challenges.[4]  *See Mole* at ¶ 26 (stating that "the standard of review in this case is the 'rational basis' test, which requires that the statute be upheld if it is rationally related to a legitimate governmental purpose").  The court in *Mole* defined the rational basis standard of review under the Ohio Constitution as follows:

> "The rational-basis test involves a two-step analysis. We must first identify a valid state interest. Second, we must determine whether the method or means by which the state has chosen to advance that interest is rational." *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, ¶ 9, citing *Buchman v. Wayne Trace Local School Dist. Bd. of Edn.*, 73 Ohio St.3d 260, 267 (1995).
>
> "Under the rational-basis standard, a state has no obligation to produce evidence to sustain the rationality of a statutory

---

[3] We note appellees' argument that LPO waived this argument because it never advanced a separate test below for equal protection analysis. LPO, however, did argue that Ohio's constitutional protections are different from those under the federal constitution. Furthermore, *Mole* was released following LPO's response to the motion for summary judgment. Therefore, for the foregoing reasons and in the interest of justice, we consider LPO's arguments related to *Mole*.

[4] We note that the court in *Mole* considered an equal protection challenge in the context of a statute prohibiting sexual conduct between a minor and a peace officer, where the peace officer was more than two years older than the minor. The court did not consider an equal protection analysis in the context of a ballot access restriction, as is the case here.

classification." *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, ¶ 91, citing *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter*, 87 Ohio St.3d at 58, 60. "[S]tatutes are presumed to be constitutional and * * * courts have a duty to liberally construe statutes in order to save them from constitutional infirmities." *Eppley* [*v. Tri-Valley Local School Dist. Bd. of Edn.*], 122 Ohio St.3d 56, 2009-Ohio-1970, ¶ 12, citing *Desenco, Inc. v. Akron*, 84 Ohio St.3d 535, 538 (1999). The party challenging the constitutionality of a statute "bears the burden to negate every conceivable basis that might support the legislation." *Columbia Gas Transm. Corp.* at ¶ 91, citing *Lyons v. Limbach*, 40 Ohio St.3d 92, 94 (1988).

*Mole* at ¶ 27, quoting *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 127 Ohio St.3d 104, 2010-Ohio-4908, ¶ 19-20. Furthermore, the court stated:

Although the legislature has no obligation to justify or even state its reasons for making a particular classification, rational-basis review, whether under Ohio constitutional principles or federal ones, does not mean toothless scrutiny. *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). And the rational-basis test requires that the classification must bear a rational relationship to a legitimate government interest or that reasonable grounds must exist for drawing the distinction. *Holeton v. Crouse Cartage Co.*, 92 Ohio St.3d 115, 131 (2001). In other words, the Equal Protection Clause requires that "in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' " *Rinaldi v. Yeager*, 384 U.S. 305, 309 (1966), quoting *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966). Thus, although we respect that the General Assembly has the power to classify, we insist that its classifications must have a reasonable basis and may not "subject individuals to an arbitrary exercise of power." *Conley v. Shearer*, 64 Ohio St.3d 284, 288 (1992). "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

*Mole* at ¶ 28. Thus, we cannot agree with LPO that the court in *Mole* created a more protective standard to employ when reviewing state equal protection challenges. However, even if we were to accept that this standard applied, as addressed below in our analysis of the *Anderson-Burdick* test, we find that S.B. No. 193 satisfies this standard of review.

**4. Analysis**

{¶ 55} Having determined that the *Anderson-Burdick* test applies to this matter, we review the trial court's application of such standard. LPO contends that even if the trial court was correct that the *Anderson-Burdick* test was the proper test to apply, it erred in concluding that S.B. No. 193 did not violate Article I, Section 2.

{¶ 56} We begin by considering "the character and magnitude of the asserted injury to the rights * * * that the plaintiff seeks to vindicate." *Anderson* at 789. When determining the magnitude of the burden imposed by state election laws, "the Supreme Court has looked to the associational rights at issue, including whether alternative means are available to exercise those rights; the effect of the regulation on the voters, the parties and the candidates; evidence of the real impact the restriction has on the process; and the interests of the state relative to the scope of the election." *Blackwell* at 587. Furthermore, "[r]estrictions that do not affect a political party's ability to perform its primary functions—organizing and developing, recruiting supporters, choosing a candidate, and voting for that candidate in a general election—have not been held to impose a severe burden." *Id.* LPO contends the trial court erred in finding that S.B. No. 193 placed only a minor burden on its rights because S.B. No. 193 "prevents new parties from registering members" and in so doing "denies [LPO] recognized membership and the resulting official membership lists that are provided to the established political parties." (LPO's Brief at 44; 40.)

{¶ 57} In Ohio, party affiliation is recognized based on a voter's request for the ballot of a political party in a partisan primary election. This is demonstrated by R.C. 3513.05 which provides that "[f]or purposes of signing or circulating a petition of candidacy for party nomination or election, an elector is considered to be a member of a political party if the elector voted in that party's primary election within the preceding two calendar years, or if the elector did not vote in any other party's primary election within the preceding two calendar years." Similarly, R.C. 3513.19(A)(3), which describes the process for challenges by precinct election officials to the right of a person to vote at a primary election, provides that "party affiliation shall be determined by examining the elector's voting record for the current year and the immediately preceding two calendar years as shown on the voter's registration card, using the standards of affiliation specified

in the seventh paragraph of section 3513.05 of the Revised Code." Thus, Ohio law describes party affiliation only in terms of voting in primary elections.

{¶ 58} S.B. No. 193 does not operate to restrict party affiliation to only major party voters. Instead, upon meeting the 3 percent vote requirement in the immediately preceding election necessary to retain its status as a minor party, a minor party may participate in the primary election process and thereby have affiliated voters. Thus, it is true that Ohio's election law scheme places some burden on minor political parties by requiring them to establish a modicum of political support before they can participate in the primary process and thereby have voters declare affiliation with their party. However, we find that LPO has not demonstrated how this amounts to a severe burden on its rights.

{¶ 59} As stated by the Sixth Circuit in its discussion of LPO's contentions:

> [LPO] emphasizes the enormous significance to political parties of having a membership, including a party member's ability to "develop" the party, recruit additional members, contribute money, and more. * * * The fundamental importance of these activities is beyond dispute. But [LPO] has not explained how Ohio's definition of "member of a political party" for the limited purpose discussed above, *see* Ohio Rev. Code [Section] 3513.05, restricts [LPO's] ability to have members that perform these core political activities.

*Husted* 831 F.3d at 402. Furthermore, the Sixth Circuit found that LPO "has not articulated * * * how this framework burdens its ability to recruit members, access the general-election ballot, or engage in other modes of political affiliation and expression," nor has LPO "explained how this places minor parties at a disadvantage relative to major parties." *Id.* We agree with the Sixth Circuit's analysis and find that S.B. No. 193 places only a minor burden on LPO.

{¶ 60} LPO cites several cases that purportedly support its argument. In *Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984, 987 (S.D.N.Y.1970), *aff'd*, 400 U.S. 806, the plaintiffs challenged under the federal Equal Protection Clause a New York state election law that required the provision, free of charge, of lists of registered voters to the county chairpersons of political parties polling at least 50,000 votes for governor in the immediately preceding gubernatorial election. However, anyone else who wished to obtain a copy of such lists would be required to pay a charge. The court found:

> It is clear that the effect of these provisions, when considered with other sections of the Election Law, is to deny independent or minority parties which have succeeded in gaining a position on the ballot but which have not polled 50,000 votes for governor in the last preceding gubernatorial election an equal opportunity to win the votes of the electorate. The State has shown no compelling state interest nor even a justifiable purpose for granting what, in effect, is a significant subsidy only to those parties which have least need therefor.

*Id.* at 995. Further, the court found that "[t]he State is not required to provide such lists free of charge, but when it does so it may not provide them only for the large political parties and deny them to those parties which can least afford to purchase them." *Id.* at 996.

{¶ 61} In *Schulz v. Williams*, 44 F.3d 48 (2d Cir.1994), a court again struck down a New York state law that was identical in "all material, unlawful respects" to the law that was found unconstitutional in *Rockefeller*. *Id.* at 60.

{¶ 62} In *Green Party v. New York State Bd. of Elections*, 389 F.3d 411 (2d Cir.2004), the election regulation at issue provided that persons filling out a voter registration form could enroll as a member of a qualified party. Only those voters who enrolled in a party were permitted to vote in a primary election. If a party failed to receive 50,000 votes for its gubernatorial candidate in an election, it was required to be treated as an independent body, not a party, in the next election. Following this change in designation, the local boards of election were required to erase the enrollment information of any member of a former party and change that person's status to non-affiliated.

{¶ 63} The plaintiffs in that case alleged that these requirements deprived them of the ability to use the enrollment list information to conduct party building activities and deprived voters of the ability to publicly declare their political affiliation. The court found the burden on these laws on the plaintiffs' associational rights was severe. In affirming the grant of a preliminary injunction against enforcement of these regulations, the court noted that "[p]arties use these enrollment lists to conduct closed primaries, but they also use the lists for many other purposes, such as identifying new voters, processing voter

information, organizing and mobilizing Party members, fundraising, and other activities that influence the political process." *Id.* at 416.

{¶ 64} In *Baer v. Meyer*, 728 F.2d 471, 475 (10th Cir.1984), the court reviewed a challenge to Colorado election law.  Under the Colorado law, a political party was a political organization whose gubernatorial candidate received at least 10 percent of the total gubernatorial vote in the last such election, whereas any other group that did not meet this requirement was a "political organization."  Under this system, only the two major parties qualified as political parties.  Persons filling out a voter registration form were permitted to designate their affiliation with a political party, if such party qualified for political party designation under Colorado law. Otherwise, the person was required to register as unaffiliated.

{¶ 65} The plaintiffs claimed that the law unreasonably burdened the ability of their supporters to note their support for their parties on voter registration forms.  In concluding that the Colorado law unnecessarily and unfairly burdened the plaintiffs, the court found that the law "prevented persons other than those affiliated with the two major political parties from obtaining and using such information in a manner similar to that of the major parties."  *Id.* at 475.  The court noted further that "under today's political realities, access to minimal information about political party affiliation is the key to successful political organization and campaigning."  *Id.*  However, the court also held that its decision was confined to the plaintiffs in that case based on the specificities of Colorado law.

{¶ 66} In *Constitution Party of Kansas v. Kobach*, 695 F.3d 1140 (10th Cir.2012), the court rejected the plaintiffs' argument that *Baer* required Kansas to treat the plaintiff as a recognized political party and track voters' affiliation with it.  Specifically, the court found that *Baer* was limited to the circumstances of the case and "was never intended to establish *per se* criteria outside [its] state-specific context." *Kobach* at 1149.

{¶ 67} Having reviewed the cases cited by LPO, we disagree that they are dispositive over the instant matter.  Unlike in *Rockefeller* and *Schulz*, in which party membership lists were provided free of charge to major parties but minor parties were required to pay, LPO does not contend that the restrictions at issue favor only major parties. By achieving a lower percentage of the vote than major parties, minor parties are

also able to participate in the primary election process and thereby have affiliated voters under Ohio law.  Additionally, unlike in *Baer* and *Green Party v. New York State Bd. of Elections*, Ohio provides for the affiliation of voters through the primary process, instead of through voter registration forms.  These cases do not address the limited circumstances for which Ohio considers party affiliation.  Furthermore, as noted by *Kobach*, *Baer* was limited to the specific circumstances of that case. Therefore, the cases cited by LPO are distinguishable from the present matter.

{¶ 68} Next, we must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule."  *Anderson* at 789.  In evaluating appellees' asserted interests, we must "determine the legitimacy and strength of each of those interests, [and] consider the extent to which those interests make it necessary to burden the plaintiff's rights."  *Id.*  The Ohio Supreme Court has listed some of the justifications that have been recognized to uphold the constitutionality of election provisions:

> (1) having orderly, fair, and honest elections instead of chaos, (2) maintaining the integrity of the political process by preventing interparty raids and intraparty feuds, (3) maintaining the integrity of various routes to the ballot, (4) avoiding voter confusion, ballot overcrowding, or frivolous candidacies, (5) ensuring that elections are operated equitably and efficiently, (6) preventing candidacies that are prompted by short-range political goals, pique, or personal quarrel, and (7) preventing parties from fielding an independent candidate to capture and bleed off votes in a general election that might otherwise go to another party.

*Purdy* at 344.

{¶ 69} Here, appellees assert that the state has an interest in ensuring that parties have significant support before allowing access to the ballot in order to prevent confusion. In support of this argument, appellees cite *Jenness v. Fortson*, 403 U.S. 431, 434 (1971), for the proposition that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot[—]the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."  This interest was also recognized by the United States Supreme Court in *Anderson*: "The State has the undoubted right to require candidates to make a

preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." *Anderson* at 788, fn. 9.

{¶ 70} Appellees also argue that it is good public policy to not require new parties to participate in a primary system. Appellees supported this interest with the deposition testimony of Richard Winger, LPO's witness who had testified as an expert on ballot access issues in ten states. Winger stated that his area of expertise was in the "history of ballot access laws in the United States and election returns, especially with focus on how well minor parties have done." (Winger Depo. at 9.) Winger testified in his deposition as follows:

> [Appellees' Counsel]: So it's not unusual for a state to make a policy choice that newly qualified political parties do not get to participate in the state run primary election; is that fair?
>
> [Winger]: Yes.
>
> [Appellees' Counsel]: In your mind why would a state make that kind of a policy choice?
>
> [Winger]: Well, I have communicated with Ohio government officials for many years to make them aware that the nation's leading election administration expert wrote in 1951 -- Dr. Joseph P. Harris -- and he wrote a model direct primary system for the National Civic League, which back then was called the National Municipal League, and he said states should not provide primaries to small parties. It's a waste of money. They seldom have primary contests. And that's one reason.
>
> Another reason is it makes it very difficult for states to have a reasonable qualifying deadline if it's going to insist that new parties nominate by primary.
>
> [Appellees' Counsel]: Any other reasons?
>
> [Winger]: When there is a contested minor party primary, frequently the voters in that primary are not well-informed. * * * I just feel when minor parties nominate by convention, the people can talk to the nominees and make an informed choice, so just as a policy matter, I favor convention nomination for small parties.

(Winger Depo. at 59-61.)

{¶ 71} Appellees also offered statistics demonstrating a low rate of participation in primary elections in Ohio. Specifically, appellees pointed out that "[d]uring the 2012 Primary election, [LPO] had only 337 individuals across the entire state cast a ballot for its Senatorial candidate." (Appellees' Brief at 49.) In 2010, Ohio had 8,013,558 registered voters, 1,814,244 of whom cast a ballot in the May primary. Of those voters who voted in the primary, 5,476 requested a Libertarian Party ballot. Based on this statistical information in addition to Winger's deposition testimony, we find that the state has demonstrated a legitimate and sufficient interest in ensuring the efficient operation of elections by limiting access to primary elections to those parties that have demonstrated a modicum of support.

{¶ 72} Therefore, weighing the limited burden imposed by S.B. No. 193 on LPO against the legitimate and sufficient interests asserted by appellees, we conclude that LPO has not established beyond a reasonable doubt that S.B. No. 193 violates the guarantee of equal protection in Article I, Section 2 of the Ohio Constitution. *Burdick* at 434. Accordingly, we overrule LPO's third, fourth, and fifth assignments of error.

## IV.  Civ.R. 56(F) Motion for Continuance

{¶ 73} In its sixth assignment of error, LPO asserts the trial court erred by denying its motion for a continuance pursuant to Civ.R. 56(F). In its decision denying LPO's motion for a continuance, the trial court found LPO failed to provide a particularized factual basis explaining why discovery was necessary.

{¶ 74} Civ.R. 56(F) provides:

> Should it appear from the affidavits of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just.

Thus, "Civ.R. 56(F) allows a party the opportunity to request additional time to obtain, through discovery, the facts necessary to adequately oppose a motion for summary judgment." *Morantz v. Ortiz*, 10th Dist. No. 07AP-597, 2008-Ohio-1046, ¶ 20.

{¶ 75} A party seeking a Civ.R. 56(F) continuance bears the burden of establishing through reasons presented in an affidavit why the party cannot present sufficient facts to

justify its opposition to a motion for summary judgment without a continuance. *Fields v. Buehrer*, 10th Dist. No. 13AP-724, 2014-Ohio-1382, ¶ 12. " 'Simply requesting a continuance in order to conduct discovery is not a sufficient explanation for why a party cannot present affidavits in opposition to the motion for summary judgment.' " *Id.*, quoting *Brown v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 12AP-891, 2013-Ohio-4207, ¶ 16, citing *ABN AMRO Mtge. Group, Inc. v. Roush*, 10th Dist. No. 04AP-457, 2005-Ohio-1763, ¶ 22.

{¶ 76} As the provisions of Civ.R. 56(F) are discretionary, we review the trial court's determination for an abuse of discretion. *Perpetual Fed. Sav. Bank v. TDS2 Prop. Mgt., LLC*, 10th Dist. No. 09AP-285, 2009-Ohio-6774, ¶ 11. An abuse of discretion occurs when a court's judgment is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 77} In support of its motion for a continuance, LPO submitted an affidavit from Robert Bridges, the chair of the Libertarian Party of Ohio. Bridges asserted in his affidavit that LPO could not present facts essential to their opposition to appellees' motion for summary judgment because discovery had not yet commenced and LPO would "need to conduct formal discovery in order to be able to adequately respond to [appellees'] many denials of allegations contained in [LPO's complaint]" and "to be able to adequately respond to [appellees'] factual assertions in their Motion for Summary Judgment." (Bridges' Affidavit at 2.) In its motion for a continuance, LPO specifically contended: "[S.B. No.] 193 lacks any legitimate justification. [LPO] believes it cannot pass the test proposed by [appellees]. In order to prove this, discovery will likely be required." (LPO's Mot. for Cont. at 7.) On appeal, LPO contends that it "was entitled to discover why S.B. No. 193 was passed." (LPO's Brief at 48.) Furthermore, LPO states that it "does not and cannot know why S.B. No. 193 was passed. It does not and cannot know S.B. No. 193's objective or what motivated its passage. LPO believes that S.B. No. 193 was a partisan measure designed to benefit the Republican Party at the expense of LPO, but LPO needs discovery to explore that theory." (LPO's Brief at 49.)

{¶ 78} However, the issue in evaluating LPO's equal protection challenge is not the *actual* reason for the passage of S.B. No. 193. Instead, the *Anderson-Burdick* test requires a court to "identify and evaluate the precise interests put forward by the State as

justifications for the burden imposed by its rule." *Anderson* at 789. Thus, a court need not inquire into the actual reasons motivating passage of a law, but instead the "legitimacy and strength" of the reasons articulated by the state as well as the "extent to which those interests make it necessary to burden the plaintiff's rights." *Id. See Crawford* at 191 (examining the legitimacy of the interests identified by the state despite petitioners' argument that the statute at issue was actually motivated by partisan concerns); *Libertarian Party of New Hampshire v. Gardner*, 126 F.Supp.3d 194, 209 (D.N.H.2015). LPO's motion for a continuance fails to address why it needed additional discovery or time to respond to this issue. Therefore, we find that the trial court did not abuse its discretion in denying LPO's motion for a continuance under Civ.R. 56(F). *Perpetual Fed. Sav. Bank* at ¶ 14.

{¶ 79} Accordingly, we overrule LPO's sixth assignment of error.

## V. Conclusion

{¶ 80} Having overruled LPO's first, third, fourth, fifth, and sixth assignments of error and having found LPO's second assignment of error to be moot, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK, P.J., and SADLER, J., concur.