[Cite as *Youngstown Cty. School Dist. v. State*, 2018-Ohio-2532.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

Youngstown City School District  :
Board of Education et al.,

                                :

        Plaintiffs-Appellants,

                                :                 No. 17AP-775

v.                                    (C.P.C. No. 15CV-7311)

                                :

State of Ohio et al.,                    (REGULAR CALENDAR)

                                :

        Defendants-Appellees.

                                :

---

## D E C I S I O N

### Rendered on June 28, 2018

---

**On brief:** *Roth, Blair, Roberts, Strasfeld & Lodge L.P.A., James E. Roberts, David S. Barbee, Christine Z. Papa*, and *Edward L. Ostrowski*, for appellant Youngstown City School District Board of Education; *R. Sean Grayson*, for appellant AFSCME Ohio Council 8 AFL-CIO; *Green, Haines, Sgambati, Co., L.P.A., Ira J. Mirkin*, and *Charles W. Oldfield*, for appellants Youngstown Education Association, Ohio Education Association, and Jane Haggerty. **Argued:** *Charles W. Oldfield*.

**On brief:** *Bricker & Eckler LLP, Maria J. Armstrong, Nicole M. Donovsky*, and *Bryan Smeenk*, Amicus Curiae Ohio School Boards Association, Buckeye Association of School Administrators, and the Ohio Federation of Teachers, in support of Appellants.

**On brief:** *Organ Cole LLP, Douglas R. Cole*, and *Carrie M. Lymanstall*, for appellees. **Argued:** *Carrie M. Lymanstall*.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiffs-appellants, Youngstown City School District Board of Education, AFSCME Ohio Council 8, AFL-CIO, Youngstown Education Association, Ohio Education Association, and Jane Haggerty (collectively, "appellants"), appeal from a judgment of the Franklin County Court of Common Pleas denying their claim for declaratory judgment and motion for permanent injunction. For the reasons that follow, we affirm.

## I.  Facts and Procedural History

{¶ 2} Appellants challenge the constitutionality of legislation introduced as H.B. No. 70 and ultimately adopted as Am.Sub.H.B. No. 70 by the Ohio General Assembly in 2015.  H.B. No. 70 was introduced in the Ohio House of Representatives on February 18, 2015, and read for the first time. As introduced, H.B. No. 70 proposed to enact new sections within R.C. Chapter 3302 authorizing school districts and community schools to create community learning centers.  On February 25, 2015, H.B. No. 70 was read a second time in the House and referred to the House Education Committee.  On May 6, 2015, H.B. No. 70 was reported out of committee with a recommendation that it be passed.  On May 19, 2015, H.B. No. 70 was read a third time in the House and passed by a vote of 92 to 6.  On May 20, 2015, H.B. No. 70 was introduced in the Ohio Senate and read for the first time. The bill was read a second time in the Senate on May 27, 2015, and referred to the Senate Education Committee.

{¶ 3} In the Senate Education Committee, H.B. No. 70 was amended twice on the morning of June 24, 2015.  One amendment expanded the definition of facilities that were eligible to become community learning centers.  The second amendment modified the structure of academic distress commissions under existing law by repealing and replacing existing R.C. 3302.10, enacting a new R.C. 3302.11, and by making changes to other sections in R.C. Chapters 3302 and 3310.  The committee adopted the second amendment by a vote of 7 to 5.  The committee then voted 8 to 4 to pass the legislation, referred to as Sub.H.B. No. 70.

{¶ 4} On the afternoon of June 24, 2015, the Senate took up Sub.H.B. No. 70 as reported by the Senate Education Committee.  Amendments were adopted on the Senate floor modifying the residency requirement for members of an academic distress commission appointed by the state superintendent of education and indicating that a chief executive officer for a school district appointed by an academic distress commission would

serve at the pleasure of the commission; thereafter, the bill was referred to as Am.Sub.H.B. No. 70. Following those amendments, the Senate passed Am.Sub.H.B. No. 70 by a vote of 18 to 14. The same day, Am.Sub.H.B. No. 70 was taken up for consideration in the House. The House voted to concur in the Senate amendments to the bill by a vote of 55 to 40. The governor signed Am.Sub.H.B. No. 70 on July 16, 2015, and the legislation became effective October 15, 2015.

{¶ 5} On August 21, 2015, appellants filed a complaint for declaratory judgment and permanent injunction in the Franklin County Court of Common Pleas, alleging the Youngstown City School District was subject to the academic distress commission provisions contained in Am.Sub.H.B. No. 70 and challenging the constitutionality of the law. Appellants also filed a motion for preliminary injunction and requested an evidentiary hearing. After conducting an evidentiary hearing on September 29 and 30, 2015, the trial court issued an order denying appellants' motion for preliminary injunction on October 13, 2015. Appellants appealed the denial of the preliminary injunction to this court. In a decision rendered February 16, 2017, this court dismissed the appeal sua sponte for lack of a final appealable order and remanded the case to the trial court. *Youngstown City School Dist. Bd. of Edn. v. State of Ohio*, 10th Dist. No. 15AP-941, 2017-Ohio-555.

{¶ 6} On remand, the parties agreed to submit the issues for final determination by the trial court based on the evidence submitted at the hearing conducted on September 29 and 30, 2015, and on briefs to be filed with the court. On October 11, 2017, the trial court issued a decision denying appellants' claims for permanent injunction and declaratory judgment and finding defendants-appellees, State of Ohio, Dr. Richard A. Ross, Superintendent of Public Instruction, and Ohio Department of Education, were entitled to judgment in their favor as a matter of law.

## II. Assignments of Error

{¶ 7} Appellants appeal and assign the following four assignments of error for our review:

> [I.] The trial court erred in finding that Plaintiffs-Appellants did not succeed on the merits of their claims.
>
> [II.] The trial court erred in finding that Plaintiffs-Appellants failed to show irreparable injury.

[III.] The trial court erred in finding that Plaintiffs-Appellants failed to show harm to third parties if an injunction is not granted.

[IV.] The trial court erred in finding that the public interest will not be served by an injunction.

## III.  Discussion

## A. Standard of Review

{¶ 8}    Appellants sought a declaratory judgment that Am.Sub.H.B. No. 70 violated the Ohio Constitution and the United States Constitution.  A claim for declaratory judgment is a civil action that provides a remedy in addition to other available legal and equitable remedies.  *State ex rel. Gelesh v. State Med. Bd.*, 172 Ohio App.3d 365, 2007-Ohio-3328, ¶ 7 (10th Dist.).  Under Ohio's declaratory judgment action statute, "any person whose rights, status, or other legal relations are affected by a * * * statute * * * may have determined any question of construction or validity arising under the * * * statute * * * and obtain a declaration of rights, status, or legal relations under it." R.C. 2721.03.  The three essential prerequisites for a declaratory judgment claim are: (1) a real controversy between the parties, (2) the controversy is justiciable, and (3) speedy relief is necessary to preserve the rights of the parties.  *Gelesh* at ¶ 7.  A trial court's determination of the justiciability of a declaratory judgment claim is reviewed for abuse of discretion; once a matter is found to be appropriate for declaratory judgment, the trial court's holdings regarding questions of law are reviewed de novo.  *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, ¶ 13.

{¶ 9}    Appellants also sought a permanent injunction preventing enforcement of Am.Sub.H.B. No. 70.  "A permanent injunction is an equitable remedy that will be granted only where the act sought to be enjoined will cause immediate and irreparable injury to the complaining party and there is no adequate remedy at law." *Franklin Cty. Dist. Bd. of Health v. Paxson*, 152 Ohio App.3d 193, 2003-Ohio-1331, ¶ 25 (10th Dist.).  "A party seeking a permanent injunction 'must demonstrate by clear and convincing evidence that they are entitled to relief under applicable statutory law, that an injunction is necessary to prevent irreparable harm, and that no adequate remedy at law exists.' " *McDowell v. Gahanna*, 10th Dist. No. 08AP-1041, 2009-Ohio-6768, ¶ 9, quoting *Acacia on the Green Condominium Assn., Inc. v. Gottlieb*, 8th Dist. No. 92145, 2009-Ohio-4878, ¶ 18.  *See also Vineyard Christian Fellowship of Columbus v. Anderson*, 10th Dist. No. 15AP-151, 2015-

Ohio-5083, ¶ 11 (holding that party seeking a permanent injunction must show that (1) it prevails on the merits, (2) it will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction). Clear and convincing evidence is more than a preponderance of the evidence but less than evidence beyond a reasonable doubt; it consists of evidence "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. The decision to grant or deny an injunction lies within the discretion of the trial court and generally will not be reversed absent an abuse of discretion. *Paxson* at ¶ 24. An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**B. Appellants' Failure to Establish Success on the Merits**

{¶ 10} In their first assignment of error, appellants assert the trial court erred by concluding they did not succeed on the merits of their claims. Appellants asserted three claims, and we will consider each of them in turn. Each of appellants' claims challenge the constitutionality of Am.Sub.H.B. No. 70. "When reviewing the constitutionality of statutes, we are guided by the presumption that enactments of the General Assembly are constitutional." *Libertarian Party of Ohio v. Husted*, 10th Dist. No. 16AP-496, 2017-Ohio-7737, ¶ 31, citing *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, ¶ 10. The party challenging the constitutionality of a statute must demonstrate beyond a reasonable doubt that the statute and the constitutional provision are incompatible. *Husted* at ¶ 31. The constitutionality of a statute is a question of law, which we review de novo on appeal. *Fowler v. Ohio Dept. of Public Safety*, 10th Dist. No. 16AP-867, 2017-Ohio-7038, ¶ 7.

**1. Claim that legislation violates Article II, Section 15(C) of the Ohio Constitution—the Three Reading Rule**

{¶ 11} Appellants argue the General Assembly violated the Three Reading Rule contained in Article II, Section 15(C) in enacting Am.Sub.H.B. No. 70. Appellants claim the amendments relating to academic distress commissions vitally altered the substance of the legislation and the General Assembly violated the Three Reading Rule because Am.Sub.H.B. No. 70 was not considered three times in each chamber and there was no vote to suspend the Three Reading Rule. Appellants argue that in addition to considering the

text of the legislation and its amendments, the court must consider the underlying purposes of the Three Reading Rule and assert that the process by which Am.Sub.H.B. No. 70 was amended and adopted did not satisfy those purposes. Appellees claim the Three Reading Rule was not violated, arguing the amendments did not vitally alter the legislation because both the introduced and final versions of the legislation shared the common purpose of restructuring and improving underperforming school districts. Appellees further claim that adopting appellants' position would result in excessive judicial encroachment on the legislative process.

{¶ 12} Article II, Section 15(C) of the Ohio Constitution governs passage of legislation by the General Assembly and provides "[e]very bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house." The Supreme Court of Ohio has held that if it can be proven that a bill was not considered three times in each legislative chamber, the bill is void and without legal effect pursuant to Article II, Section 15(C). *Hoover v. Bd. of Cty. Commrs.*, 19 Ohio St.3d 1, 3 (1985). The court has further held that when a bill is amended during the legislative process, "amendments which do not vitally alter the substance of a bill do not trigger a requirement for three considerations anew of such an amended bill." *Id.* at 5.

{¶ 13} The plaintiff in *Hoover* asserted the challenged legislation had been introduced and adopted by the Senate as a measure pertaining to criminal non-support, but had been amended in the House Judiciary Committee through a "substitute bill, *completely different in content*" from the original measure, dealing with financing, acquisition, and construction of hospitals and healthcare facilities. (Emphasis sic.) *Hoover* at 5. The Supreme Court held that the plaintiff's claim survived a motion for summary judgment because it alleged that the version of the bill passed by the House was "entirely different in title and subject matter" from the version passed by the Senate, and that the revised version had not been considered by the Senate on three different days. *Id.* In a concurring opinion, Justice Douglas addressed the purpose of the Three Reading Rule:

> [T]he purpose of the "three reading" rule is to prevent hasty action and to lessen the danger of ill-advised amendment at the last moment. The rule provides time for more publicity and

> **greater discussion and affords each legislator an opportunity to study the proposed legislation, communicate with his or her constituents, note the comments of the press and become sensitive to public opinion. Adherence to this rule will help to ensure well-reasoned legislation.**

*Id.* at 8.

{¶ 14} The Supreme Court subsequently expounded on the Three Reading Rule in a later decision, *State ex rel. AFL-CIO v. Voinovich*, 69 Ohio St.3d 225 (1994). Commenting on *Hoover*, the court noted that the bill in *Hoover* was "wholly changed" and that mere deference to legislative journals to enforce compliance with the Three Reading Rule was not enough. Rather, "a more demanding constitutional test is one that examines whether a bill was 'vitally altered,' departing *entirely* from a consistent theme. (Emphasis added.) *Id.* at 233. The court held "a legislative Act is valid if the requisite entries are made in the legislative journals and there is no indication that the *subject matter of the original bill was* '*vitally altered*' such that there is no longer a common purpose or relationship between the original bill and the bill as amended." (Emphasis sic.) *Id.* The court concluded in *Voinovich* that the challenged legislation had been heavily amended but not vitally altered. It began as a measure to make appropriations for the Ohio Bureau of Workers' Compensation and was then amended by a House committee, on the floor of the House, by a Senate committee, on the floor of the Senate, and by a conference committee. The final version of the legislation abolished the existing Industrial Commission of Ohio, created a new version of the Industrial Commission, substantially amended workers' compensation law, and made appropriations for the Bureau of Workers' Compensation and the Industrial Commission. *Id.* The court determined that despite the extensive amendments, the final version of the bill "retain[ed] its common purpose to modify the workers' compensation laws." *Id* at 234.

{¶ 15} The *Voinovich* court further stated that the difference between a heavily amended bill and a vitally altered bill is one of degree. It noted that Article II, Section 15(A) of the Ohio Constitution "reserves to each house the right to freely alter, amend or reject bills introduced by either [house]. This court would be setting dangerous and impracticable precedent if it undertook a duty to police any such difference of degree."[1] *Id.* at 233. The

---

[1] In relevant part, Article II, Section 15(A) of the Ohio Constitution provides that "[b]ills may originate in either house, but may be altered, amended, or rejected in the other."

court suggested instead that it was necessary to consider the underlying purpose of the Three Reading Rule and pointed to the purpose language from Justice Douglas's concurrence in *Hoover*. *Id.* However, the court expressly declined to extend the *Hoover* analysis to the legislation before it. *Id.* at 234. The court noted both chambers of the General Assembly had deliberated on the bill and various amendments for several months and the Governor stimulated debate regarding the bill by announcing he would veto any appropriations bill that did not substantially reform the workers' compensation system. *Id.* The court held that declaring the bill unconstitutional under the Three Reading Rule "would place this court in the position of directly policing every detail of the legislative amendment process when bills are passed containing a *consistent theme*." (Emphasis added.) *Id. See also Comtech Sys., Inc. v. Limbach*, 59 Ohio St.3d 96, 100 (1991) (holding that adding a new object of taxation to an appropriations bill did not vitally alter the substance of the bill because "[r]aising and spending revenue are at the heart of an appropriations bill").

{¶ 16} This court recently applied the Three Reading Rule in a challenge to legislation eliminating certain mayor's courts. *Village of Linndale v. State*, 10th Dist. No. 14AP-21, 2014-Ohio-4024. As introduced, the challenged legislation eliminated one full-time judge from the Youngstown Municipal Court. *Id.* at ¶ 2. That version of the bill was read three times and adopted by the House and read twice in the Senate before being referred to the Senate Judiciary Committee on December 11, 2012. In committee, the legislation was amended to eliminate certain mayor's courts and clarify the effect of state and municipal prohibitions on texting while driving. On December 13, 2012, the Senate passed the amended version of the legislation and the following day the House concurred in the Senate amendments to the bill. *Id.* On appeal from a judgment granting a motion to dismiss, this court held that the amendment to the legislation eliminating certain mayor's courts did not vitally alter the original bill. We concluded that the amended version of the legislation retained a common purpose with the original version, holding that "while the amended bill contained two topics, they shared a common relationship of regulating the organization and structure of Ohio's statutory courts." *Id.* at ¶ 22. Further, the court noted that when the full Senate considered the amended version of the legislation, no member sought to strip the amendment or otherwise alter or further amend the legislation.

Likewise, when the full House considered and voted to concur in the Senate amendments, no member sought to remove those amendments or otherwise amend the legislation.  *Id.* at ¶ 23.

{¶ 17} In the present case, each chamber of the General Assembly considered the legislation on three different occasions, but considered the final, amended version of the legislation only once.  The question before us, therefore, is whether the subject matter of the legislation was vitally altered by the amendments, departing entirely from a consistent theme, such that there was no longer a common purpose or relationship between the original legislation and the amended legislation. *See Voinovich* at 233.

{¶ 18} As introduced, H.B. No. 70 was a relatively brief bill comprising of 10 pages that proposed to enact three new sections under R.C. Chapter 3302 authorizing school districts and community schools to create community learning centers.  As finally adopted by both chambers of the General Assembly, Am.Sub.H.B. No. 70 was comprised of 77 pages and amended or enacted new sections of law in R.C. Chapters 133, 3302, 3310, 3311, and 3314. The amendments to the legislation primarily involved revising the law related to academic distress commissions. Appellants cite to the increased length and complexity of Am.Sub.H.B. No. 70 in arguing that the amendments vitally altered the original legislation. However, in determining whether legislation was vitally altered by amendments, we must focus on the content of the amendments and ascertain whether there remained "a common purpose or relationship between the original bill and the bill as amended." *Voinovich* at 233.

{¶ 19} H.B. No. 70, as introduced, authorized the creation of community learning centers in underperforming school buildings. If the community learning center process was initiated, the board of education was required to create a school action team composed of 12 members, including 7 parents or guardians of students enrolled in the school and members of the community, and 5 teaching or non-teaching employees assigned to the school. R.C. 3302.18(A).  The school action team would conduct a performance audit of the school and propose an improvement plan.  R.C. 3302.17(E) and (F).

{¶ 20} As amended, Am.Sub.H.B. No. 70 retained the community learning center provisions, and added provisions revising the law related to academic distress commissions.  It provided that an academic distress commission was to be established for

any school district that received an overall failing grade for three consecutive years or had been subject to an academic distress commission under prior law for at least four years. R.C. 3302.10(A). The academic distress commission would be comprised of three members appointed by the state superintendent of education, one teacher employed by the district to be appointed by the president of the board of education, and one member appointed by the mayor of the appropriate municipality. R.C. 3302.10(B)(1). The academic distress commission would then appoint a chief executive officer, whose duties would include creating a plan to improve the district's academic performance, subject to the review and approval of the commission. R.C. 3302.10(E).

{¶ 21} In this case, the original legislation and the amended final version not only involved the same general subject area of education, but the specific subject of improving underperforming schools. Notably, the community learning center provisions contained in the original legislation were retained in the final version, with some changes through the amendment process. Unlike the scenario in *Hoover*, Am.Sub.H.B. No. 70 was not completely different in content from H.B. No. 70 as introduced. Rather, the original version, which provided one method of improving underperforming schools, was amended to include another method of improving underperforming schools. Thus, the legislation at issue in this case is more analogous to the heavily amended bill in *Voinovich* or to the legislation considered by this court in *Village of Linndale*, each of which did not violate the Three Reading Rule.

{¶ 22} Appellants also argue the process by which Am.Sub.H.B. No. 70 was amended and adopted violated the purposes of the Three Reading Rule, asserting the amendments were drafted in secret to deny the opportunity for debate and pushed through both chambers of the General Assembly in a single day. Appellants claim this distinguishes the present case from *Voinovich*, where the court found the amendments had been debated for several months and were subject to multiple hearings.

{¶ 23} In the present case, it is clear that amendment and adoption of Am.Sub.H.B. No. 70 occurred quickly. Amendments to the legislation were adopted in the Senate Education Committee on the morning of June 24, 2015, and the full Senate considered the amended bill later that afternoon. The House voted to concur in the Senate amendments later that same day. Thus, this case does not involve the same sort of lengthy, deliberative

process described by the *Voinovich* court, and a more deliberative process may be preferred. However, we are mindful of the *Voinovich* court's warning that it would be inappropriate to "polic[e] every detail of the legislative amendment process when bills are passed containing a consistent theme," its declining to extend the *Hoover* analysis, and examination as to whether the legislation departed *entirely* from a consistent theme. *Voinovich* at 234. We conclude that H.B. No. 70 as introduced and Am.Sub.H.B. No. 70 as adopted shared a common purpose of providing measures to improve underperforming schools. Moreover, although the amendment and adoption process occurred quickly in this case, the record reflects that legislators who opposed the amendments were able to present their arguments to their colleagues.[2]

{¶ 24} As to the merits of this claim, based on the record before us, appellants have failed to prove beyond a reasonable doubt that the General Assembly violated Article II, Section 15(C) of the Ohio Constitution in enacting Am.Sub.H.B. No. 70.

---

[2] Appellants introduced transcripts of the Senate and House proceedings on Am.Sub.H.B. No. 70 demonstrating that opponents of the amendments spoke out against them and urged their colleagues to oppose them. On the floor of the Senate, Senator Lehner, the chair of the education committee, argued in favor of the legislation but acknowledged the amendments had been brought to her committee late and that some committee members were concerned the amendments had not been properly vetted. Senator Sawyer argued against the legislation, asserting that the amendments had not been adequately vetted and arguing that more time was needed to build consensus on the appropriate reforms. Similarly, Senators Schiavoni, Thomas, Tavares, Skindell, Yuko, and Brown argued extensively against the bill, asserting concerns that the amendments had been drafted by a small group of people and had been introduced too quickly without providing adequate time for review and consideration. Senator Brown moved to recommit the bill to the education committee and that motion was defeated. Senator Schiavoni also offered two amendments to the legislation on the floor of the Senate modifying the residency requirement for members of the academic distress commission appointed by the state superintendent of education and indicating that a chief executive officer for a school district appointed by an academic distress commission would serve at the pleasure of the commission; these amendments were adopted without objection. Following the floor discussion and amendment, the Senate passed Am.Sub.H.B. No. 70 by a vote of 18 to 14.

In the House, similar objections were expressed. One of the original sponsors of the legislation, Representative Driehaus, argued against the amendments, citing, in part, the speed with which the legislation was amended and urging her colleagues not to concur in the Senate amendments. Representatives Lepore-Hagan, O'Brien, Gerberry, Ramos, Fedor, and Strahorn also expressed concerns about the content and complexity of the Senate amendments and the speed with which they were adopted. After the floor discussion, the House voted to concur in the Senate amendments to the bill by a vote of 55 to 40, whereas the House had passed the original version of H.B. No. 70 by a vote of 92 to 6. This extensive record establishes that members of the Senate and House were made aware of the speed with which the amendments had been adopted and the concerns arising from that process. Thus, although the amendments proceeded quickly there was significant debate and discussion before each chamber adopted the final version of Am.Sub.H.B. No. 70. Under these circumstances, we cannot conclude that the underlying purpose of the Three Reading Rule was violated.

**2. Claim that legislation violates Article VI, Section 3 of the Ohio Constitution relating to school boards**

{¶ 25} Appellants further argue Am.Sub.H.B. No. 70 violates Article VI, Section 3 of the Ohio Constitution, which provides, in relevant part, that "each school district embraced wholly or in part within any city shall have the power by referendum vote to determine for itself the number of members and the organization of the district board of education." Appellants assert Am.Sub.H.B. No. 70 usurps all powers of elected school boards by granting the chief executive officer appointed by an academic distress commission complete operational, managerial, and instructional control over the school district, thereby rendering meaningless the constitutional rights guaranteed under Article VI, Section 3.

{¶ 26} The Supreme Court has held that the General Assembly has broad authority over public schools. "Under Sections 1, 2, and 3 of Article VI of the Ohio Constitution, the General Assembly is given exceedingly broad powers to provide a thorough and efficient system of common schools by taxation, and for the organization, administration, and control thereof." *State ex rel. Core v. Green*, 160 Ohio St. 175, 180 (1953). "It follows that the General Assembly has the power to provide for the creation of school districts, for changes and modifications thereof, and for the methods by which changes and modifications may be accomplished, and, where it has provided methods by which changes in school districts may be made, no citizen has a vested or contractual right to the continuation of such methods, and if a particular method is abolished or changed by legislative enactment there can be no basis for a claim that a contractual or vested right is impaired." *Id. See also State ex rel. Maxwell v. Wilson*, 106 Ohio St. 224, 228 (1922) ("The whole question of school organization and management has been by the constitution left in the hands of the general assembly, with comparatively few constitutional restrictions."); *State ex rel. Maxwell v. Schneider*, 103 Ohio St. 492, 497 (1921) ("Section 3, Article VI of the Ohio Constitution, confers upon the legislature full power and authority over the organization, administration and control of the public school system of the state.").

{¶ 27} The Supreme Court rejected a similar challenge pursuant to Article VI, Section 3 to laws authorizing charter schools. *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, ¶ 42-47. The law

provided that charter schools were public schools but were independent of any school district. *Id.* at ¶ 7. The challengers argued the law usurped the right of local educational self-determination by authorizing the creation of charter schools that were not governed by locally elected school boards. *Id.* at ¶ 14. The Supreme Court rejected this argument, holding that "Section 3, Article IV [sic] governs questions of size and organization, not the power and authority, of city school boards." *Id.* at ¶ 47. The court further noted that boards of education only have the powers that are conferred by statute. *Id.* The court held the challengers failed to prove that by permitting charter schools to be independent of city school boards the law usurped the powers of the city school districts, thereby rendering the law unconstitutional. *Id.* Similarly, the Seventh District Court of Appeals rejected a challenge to the School District Fiscal Emergency law, which authorized appointment of a financial planning and supervision commission for a school declared to be in a state of fiscal emergency. *E. Liverpool Edn. Assn. v. E. Liverpool City School Dist. Bd. of Edn.*, 177 Ohio App.3d 87, 2008-Ohio-3327, ¶ 34-42 (7th Dist.). Under the law, the commission had authority to reduce the number of teachers in a school district, even if an applicable collective bargaining agreement provided otherwise. *Id.* at ¶ 4. Finding that the commission was appointed only to assume the school board's fiscal responsibilities while the state of fiscal emergency existed, but that the elected school board retained all other rights and duties, the court concluded the law did not violate Article VI, Section 3 by usurping the authority of the elected school board. *Id.* at ¶ 39.

{¶ 28} Appellants argue Am.Sub.H.B. No. 70 is distinguishable from the laws challenged in *Congress of Parents & Teachers* and *E. Liverpool* because it usurps all powers of the elected school board. Pursuant to R.C. 3302.10(C)(1), a chief executive officer appointed by an academic distress commission "shall exercise complete operational, managerial, and instructional control of the district" and provides a non-exclusive list of powers and duties the chief executive officer may exercise. Citing this provision, appellants argue that the chief executive officer assumes all powers of the school board.

{¶ 29} Although the language of R.C. 3302.10(C)(1) grants broad authority to a chief executive officer appointed by an academic distress commission, it does not appear to usurp *all* powers of the elected school board. For example, pursuant to R.C. 5705.21, a school board may, by a two-thirds vote of its members, adopt a resolution seeking to impose an

additional tax levy, subject to approval by the electors of the district. Appellants argue that because there is no language in R.C. 3302.10(C)(1) limiting a chief executive officer's authority, it necessarily encompasses all of the school board's powers. However, the phrase "operational, managerial, and instructional control" in R.C. 3302.10(C)(1) constitutes an implicit limit on a chief executive officer's authority. Had the General Assembly intended to give the chief executive officer authority to perform all of the school board's duties, it could have written the statute to provide that the chief executive officer would exercise complete control of the district, without including the limiting phrase "operational, managerial, and instructional control."

{¶ 30} Thus, in this case, as in the *E. Liverpool* decision, as to the merits of this claim, appellants have failed to prove beyond a reasonable doubt that Am.Sub.H.B. No. 70 violates Article VI, Section 3 of the Ohio Constitution.

## 3. Claim that legislation violates the Equal Protection Clauses of the Ohio Constitution and the United States Constitution

{¶ 31} Appellants further claim Am.Sub.H.B. No. 70 violates the Equal Protection Clause by denying the fundamental right to vote for members of the school board. This court recently addressed the scope of the Equal Protection Clauses of the state and federal constitutions:

> Article I, Section 2 [of the Ohio Constitution] provides in pertinent part: "All political power is inherent in the people. Government is instituted for their equal protection and benefit." The Fourteenth Amendment, Section 1 to the United States Constitution provides in pertinent part that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws."
>
> "An equal protection analysis of any law centers upon the law's classification of persons and whether the classification relates to a legitimate government interest." *Mole* at ¶ 24, citing *State ex rel. Doersam v. Indus. Comm.*, 45 Ohio St.3d 115, 119-20 (1989). The federal guarantee of equal protection does not deny the government the power to treat different classes of persons in different ways, but rather denies the power to provide that "different treatment be accorded to persons placed by a statute in to different classes on the basis of criteria wholly unrelated to the objective of that statute." (Quotations and citation omitted.) *Johnson v. Robison*, 415 U.S. 361, 374 (1974). *See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439

(1985) (stating that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike").

*Husted* at ¶ 43-44.  When a law infringes on a fundamental right, it is subject to strict scrutiny; where no fundamental right is involved, we apply a rational-basis test.  *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, ¶ 64. Under the rational-basis test, a statute will be upheld if it is rationally related to a legitimate government purpose.  *Id.* at ¶ 66.

{¶ 32} Appellants concede that voters can still cast ballots for elected school board members, but argue these votes are meaningless because Am.Sub.H.B. No. 70 eliminates the authority of the school board.  In effect, appellants argue voters in a school district where an academic distress commission is appointed would be denied equal protection of the law because the school board members they vote into office have less authority than school board members in other districts.

{¶ 33} The United States Supreme Court has held there is "no constitutional reason why state or local officers of the nonlegislative character * * * may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election." *Sailors v. Bd. of Edn. of Kent Cty.*, 387 U.S. 105, 108 (1967).  Based on this holding, state and federal courts in Ohio have held there is no fundamental right to elect an administrative body, such as a school board.  *Mixon v. Ohio*, 193 F.3d 389, 403 (6th Cir.1999); *Spivey v. Ohio*, 999 F.Supp. 987, 995 (N.D.Ohio 1998); *Shelby Assn. of Support Staff v. Shelby City School Dist. Bd. of Edn.*, 5th Dist. No. 06CA86, 2008-Ohio-1388, ¶ 33; *Barnesville Edn. Assn. OEA/NEA v. Barnesville Exempted Village School Dist. Bd. of Edn.*, 7th Dist. No. 06 BE 32, 2007-Ohio-1109, ¶ 40-42.  Accordingly, we apply rational-basis review to appellants' equal protection claims.

{¶ 34} In *Mixon*, the United States Court of Appeals for the Sixth Circuit considered a challenge to a law changing the composition and size of the Cleveland school board by allowing the mayor to appoint a new school board, where the board had previously been elected by residents of the school district.  *Mixon* at 393. Applying rational-basis scrutiny, the court noted the flexibility and potential benefits resulting from an appointed school board and concluded the law was rationally related to the state's legitimate purpose of improving the quality of public schools.  *Id.* at 403-04.  Similarly, in *Barnesville*, the

Seventh District Court of Appeals rejected an equal protection challenge to the school district fiscal emergency statute (the same law challenged in the *E. Liverpool* decision), holding there was a rational relationship between the statute and the state's legitimate interests in ensuring the proper education of children and the fiscal integrity of school districts. *Barnesville* at ¶ 47-50. *See also Shelby* at ¶ 42-46 (concurring in reasoning of *Barnesville* decision).

{¶ 35} As the Supreme Court of Ohio noted in *Ohio Congress of Parents & Teachers*, the Ohio Constitution requires establishment of a system of common schools and the state has an interest in ensuring that all children receive an adequate education that complies with the Thorough and Efficient Clause contained in Article VI, Section 2 of the Ohio Constitution. *Ohio Congress of Parents & Teachers* at ¶ 32. Pursuant to R.C. 3302.10(A), as enacted through Am.Sub.H.B. No. 70, an academic distress commission may be established for any school district that has received an overall failing grade for three consecutive years or where an academic distress commission had been established under prior law and had been in existence for at least four years. Thus, the changes authorized under the law are limited to school districts that are consistently underperforming. Similar to the law permitting mayoral appointment of certain school boards that was upheld in *Mixon*, Am.Sub.H.B. No. 70 is rationally related to the state's legitimate interest in ensuring a quality education system and improving the quality of underperforming public schools.

{¶ 36} Thus, based on the record in this case, appellants have failed to establish beyond a reasonable doubt that Am.Sub.H.B. No. 70 violates the Equal Protection Clause of the Ohio Constitution or the United States Constitution.

{¶ 37} Accordingly, we overrule appellants' first assignment of error.

{¶ 38} Having concluded that appellants' failed to demonstrate success on the merits of their claims, their remaining assignments of error are likely rendered moot. However, in the interest of justice, we will consider appellants' arguments.

**C. Appellants' Failure to Show Irreparable Injury**

{¶ 39} Appellants argue in their second assignment of error the trial court erred by concluding they failed to show irreparable injury would occur if the injunction was not granted. In support of this assignment of error, appellants cite various provisions of R.C. 3302.10(G) and (H), authorizing a chief executive officer appointed by an academic distress

commission to reconstitute or close schools, replace school administrators, teachers, and staff, reopen collective bargaining agreements, and contract with a non-profit or for-profit entity to manage operations of the school. However, as appellees note, Am.Sub.H.B. No. 70 went into effect on October 15, 2015, and appellants have not demonstrated any irreparable injury that has occurred during the intervening period. Under these circumstances, we cannot conclude the trial court abused its discretion by concluding appellants failed to show that immediate and irreparable harm would result if a permanent injunction was not granted.

{¶ 40} Accordingly, we overrule appellants' second assignment of error.

## D. Appellants' Failure to Show an Injunction Would Not Cause Harm to Third Parties and Would Serve the Public Interest

{¶ 41} Appellants claim in their third assignment of error the trial court erred by concluding they failed to establish that third parties would not be harmed by granting a permanent injunction. In their fourth assignment of error, appellants assert the trial court erred by concluding they failed to establish that granting an injunction would serve the public interest. Because appellants raise similar arguments in support of their third and fourth assignments of error, we will consider them together.

{¶ 42} Appellants argue third parties and the public have an interest in ensuring that the protections of the Ohio Constitution are preserved and that laws are properly enacted, as well as ensuring the right to vote is protected. Appellants further assert that third parties would not be harmed by the grant of a permanent injunction because enjoining Am.Sub.H.B. No. 70 would retain the academic distress commission that existed in Youngstown under prior law.

{¶ 43} The trial court concluded appellants failed to prove that third parties would not be harmed by granting an injunction, noting that if Am.Sub.H.B. 70 was enjoined, the chief executive officer to be appointed by a newly constituted academic distress commission would be prevented from creating an improvement plan for the school district. With respect to appellants' public interest arguments, the trial court concluded that while the public has interests in ensuring constitutional rights are preserved, the public also has an interest in having effective public schools, and that the latter interest was served by Am.Sub.H.B. No. 70.

{¶ 44} Appellants' argument that third parties would not be harmed by granting a permanent injunction is implicitly based on a presumption that the Youngstown school district would improve if the existing academic distress commission structure was left in place. In support of their motion for preliminary injunction and in their brief on appeal, appellants cite only to testimony from the superintendent of the school district stating his belief that the school district was on its way to recovery when he was hired shortly before passage of Am.Sub.H.B. No. 70. Under these circumstances, we cannot conclude the trial court abused its discretion by determining appellants failed to demonstrate by clear and convincing evidence that granting a permanent injunction would not harm third parties. Similarly, as explained above, we find that Am.Sub.H.B. No. 70 does not violate the protections provided under the Ohio Constitution or the United States Constitution. Therefore, we cannot conclude the trial court abused its discretion by rejecting appellants' assertion that the public interest would be served by granting a permanent injunction.

{¶ 45} Accordingly, we overrule appellants' third and fourth assignments of error.

## IV. Conclusion

{¶ 46} For the foregoing reasons, we overrule appellants' four assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN, P.J., concurs.
TYACK, J., dissents.

TYACK, J., dissenting.

{¶ 47} I do not agree with the majority of this panel on the issue of the Three Reading Rule because the various amendments did vitally alter the legislation. Since the Three Reading Rule is a very simple requirement to meet, I do not foresee judicial encroachment on the legislative process. All the Ohio legislature has to do is comply with the simple rules applicable to passing laws. Here, it did not.

{¶ 48} A bill does not have to be wholly changed in order to be vitally altered. I note that Am.Sub.H.B. No. 70 went from being a 10 page bill to a 77 page bill in a period of less than 24 hours. It was then passed on a party-line vote. It went from allowing school districts to create community learning centers to a law which allowed the state of Ohio to take complete control of a school district, pitching the local school board and local

superintendent out of the day-to-day running of the school district. I see this as vitally altering a bill with little or no opportunity for input from the full range of interested parties. Such input as occurred came from the political friends of the Governor of Ohio and from persons closely wired to the leadership of the Ohio General Assembly.

{¶ 49} The persons who wrote the Ohio Constitution displayed impressive wisdom. They said bills should have three readings so the public can know what is being considered and possibly passed. They said bills should have one subject, not one part to create community learning centers and another part which allows government to divest control of the local school district from local elected leadership to persons chosen by state leadership. We ignore the wisdom of the persons who drafted our Ohio Constitution at great peril to good government.

{¶ 50} I respectfully dissent from the majority opinion.